1  Xinyao Zhou
   1885 Lundy Ave.
2  Suite 108
   San Jose, CA 95131
3  Plaintiff, in Pro Per

4           **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
5                      **SAN JOSE DIVISION**

| | |
|---|---|
| XINYAO ZHOU | Case No.5:25-cv-04625 NC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT** |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; IMMIGRANT INVESTOR PROGRAM OFFICE; ANGELICA ALFONSO-ROYALS, in her official capacity as Senior Official Performing the Duties of the Director, United States Citizenship and Immigration Services; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and PAM BONDI, in her official capacity as Attorney General of the United States, | Judge: NATHANAEL M. COUSINS File Date: August 12, 2025 Original Complaint Filed: June 2,2025 |
| Defendants. | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE**

**RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT**

**Immigration Case**

**To the Honorable Judge of Said Court:**

**PRELIMINARY STATEMENT**

1. This action challenges an arbitrary and capricious agency interpretation that imposes an unworkable compliance burden on EB-5 immigrant investors. Plaintiff does not challenge the overall legality or structure of the EB-5 program. Rather, this case concerns a narrow but critical issue: whether USCIS can require an EB-5 petitioner to prove the lawful source of funds invested by other, non-petitioning investors in the same commercial enterprise—a requirement that appears nowhere in the statute or regulations, that USCIS has applied inconsistently, and that contradicts the judicial limits on source-of-funds requirements recently established in *Battineni v. Mayorkas, No. 22-cv-1332 (D.D.C. Oct. 2, 2024)*. This lawsuit is brought in good faith, not only to obtain judicial relief from an unlawful denial that irreparably harms Plaintiff's immigration eligibility, but also to clarify a regulatory ambiguity affecting many similarly situated EB-5 investors.

2. USCIS's interpretation creates an impracticable standard that effectively bars qualified investors from participating in the EB-5 program. By requiring petitioners to verify the confidential finances of third parties—information neither required by regulation nor accessible through any lawful mechanism—USCIS unlawfully shifts the burden of proof and imposes obligations beyond its statutory authority.

**INTRODUCTION**

3. This is a Complaint for declaratory and injunctive relief challenging unlawful agency action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., and the Due Process and Equal Protection guarantees of the Fifth Amendment to the United States Constitution.

4. Plaintiff brings this action to challenge the unlawful denial of her Form I-526, Immigrant Petition by Alien Entrepreneur (the "Petition"), by the United States Citizenship and Immigration Services ("USCIS"), based on an erroneous interpretation of 8 C.F.R. §§ 204.6(e) and (g)(1), and departure from USCIS's own Policy Manual, Volume 6, Part G, Chapter 2.

5. The Petition was initially filed with USCIS on October 14, 2016, assigned case number WAC1790023144.

6. After nearly four years of processing, USCIS denied the Petition on July 23, 2020.

7. Plaintiff timely filed a motion to reopen, which was dismissed on May 11, 2021.

8. Plaintiff timely appealed to the Administrative Appeals Office ("AAO"), which dismissed the appeal on June 16, 2022 (**Exhibit A**).

9. Plaintiff filed a motion to reconsider challenging the agency's interpretation of "capital," which was dismissed on January 31, 2023 (**Exhibit B**).

10. The dismissal letter Plaintiff received was incomplete, missing the first page. Plaintiff obtained the complete version from the USCIS website's AAO

1    decisions database, which redacts certain information before public posting (**Exhibit**

2    **B**).

3          11. Having exhausted all administrative remedies, Plaintiff now seeks judicial

4    review of Defendants' unlawful action.

5    **JURISDICTION**

6          12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

7    (federal question), 28 U.S.C. §§ 2201 and 2202 (declaratory relief), and 5 U.S.C. §

8    706 (Administrative Procedure Act).

9          13. Under 5 U.S.C. § 706(2)(A), this Court may "hold unlawful and set aside

10    agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

11    discretion, or otherwise not in accordance with law." This case presents such agency

12    action requiring judicial correction.

13          14. Plaintiff has Article III standing to pursue this action. Plaintiff has suffered

14    concrete injury through the denial of her immigrant petition, which prevents her from

15    obtaining lawful permanent resident status and its attendant benefits.

16          15. Moreover, Plaintiff suffers ongoing injury from the uncertainty regarding

17    her immigration status. As recognized in *Amadei v. Nielsen, 348 F. Supp. 3d 145, 158*

18    *(E.D.N.Y. 2018)*, "fear or anxiety of future harm" constitutes injury-in-fact. Having

19    invested eight years in the EB-5 process, Plaintiff must now restart the entire process

20    with no certainty of eventual success.

21    **VENUE**

22

4

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C), which provides that an action against federal agencies may be brought in any judicial district where the plaintiff resides. Plaintiff resides in San Jose, California, within the Northern District of California, and no real property is involved in this action.

## PARTIES

17. Plaintiff XINYAO ZHOU is a citizen of China who currently resides in San Jose, California. She brings this action to challenge Defendants' unlawful interpretation and application of the EB-5 regulations.

18. Defendant UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS") is a federal agency within the Department of Homeland Security responsible for administering the nation's immigration system, including the adjudication of EB-5 immigrant investor petitions.

19. Defendant U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS") is the federal department that encompasses USCIS and is responsible for immigration enforcement and administration.

20. Defendant PAM BONDI is the Attorney General of the United States. She shares responsibility with the Secretary of DHS for the enforcement of immigration laws. She is sued in her official capacity.

21. Defendant KRISTI NOEM is the Secretary of the U.S. Department of Homeland Security. She is ultimately responsible for the administration and enforcement of immigration laws. She is sued in her official capacity.

22. Defendant ANGELICA ALFONSO-ROYALS is the Acting Director of USCIS and is responsible for the processing and adjudication of all immigration benefit applications submitted to USCIS, including EB-5 petitions. She is sued in her official capacity.

<b>STATUTORY AND REGULATORY FRAMEWORK</b>

**A. The Administrative Procedure Act**

23. Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

24. Section 706 of the APA directs reviewing courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

25. Under 5 U.S.C. § 706(2)(A), courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

26. The APA, 5 U.S.C. § 553, requires agencies to engage in notice-and-comment rulemaking when promulgating substantive rules.

27. The APA, 5 U.S.C. § 555(b), requires agencies to provide parties with the opportunity to present arguments and evidence in support of their positions.

**B. The EB-5 Program and Relevant Regulations**

28. The EB-5 immigrant investor program, codified at 8 U.S.C. § 1153(b)(5), provides a pathway to permanent residence for foreign nationals who invest capital in

1  new commercial enterprises that create jobs for U.S. workers. Under Subsection

2  (b)(5)(L), Source of funds, the statute requires that "An alien investor shall

3  demonstrate that the capital required under subparagraph (A) and any funds used to

4  pay administrative costs and fees associated with the alien's investment were obtained

5  from a lawful source and through lawful means." (**Exhibit C**)

6      29. The implementing regulation at 8 C.F.R. § 204.6(e) defines "capital" as:

7      "cash, equipment, inventory, other tangible property, cash equivalents, and

8  indebtedness secured by assets owned by the alien investor, provided that the alien

9  investor is personally and primarily liable and that the assets of the new commercial

10  enterprise upon which the petition is based are not used to secure any of the

11  indebtedness." (**Exhibit D**)

12      30. The regulation at 8 C.F.R. § 204.6(g)(1) provides:

13      "The establishment of a new commercial enterprise may be used as the basis

14  of a petition for classification as an alien entrepreneur even though there are several

15  owners of the enterprise, including persons who are not seeking classification under

16  section 203(b)(5) of the Act and non-natural persons, both foreign and domestic,

17  provided that the source(s) of all capital invested is identified and all invested capital

18  has been derived by lawful means." (**Exhibit D**)

19      31. The regulation at 8 C.F.R. § 204.6(j) requires evidence that "the petitioner

20  has invested or is actively in the process of investing the required amount of capital"

21  and that such capital "has been derived by lawful means." (**Exhibit D**)

22

32. The regulation at 8 C.F.R. § 216.6(c)(2) confirms that the lawful source requirement focuses on the petitioner's own funds, stating: "If derogatory information is determined regarding the source of the investor's funds or it becomes known that the investor obtained his or her investment funds through other than legal means, USCIS shall offer the investor the opportunity to rebut such information." This regulation contains no provision empowering USCIS to deny a petition based on the source of funds invested by other parties. (**Exhibit E**)

33. The EB-5 Reform and Integrity Act of 2022 clarified the definition of "capital" for petitions filed after March 15, 2022, as "cash and all real, personal, or mixed tangible assets owned and controlled by the investor, or held in trust for the benefit of the investor and to which the investor has unrestricted access." (**Exhibit F**)

**C. Constitutional Provisions**

34. The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law.

35. The Equal Protection component of the Fifth Amendment's Due Process Clause prohibits the federal government from denying any person equal protection under the law.

**STATEMENT OF FACTS**

**A. Plaintiff's EB-5 Petition**

36. On October 14, 2016, Plaintiff filed Form I-526, Immigrant Petition by Alien Entrepreneur, with USCIS, seeking classification as an EB-5 immigrant investor.

37. Plaintiff's petition was based on her investment in Hotel Winters, LLC (the "NCE"), a new commercial enterprise established to develop and operate a hotel project.

38. Plaintiff invested the statutorily required amount of capital and provided extensive documentation demonstrating that her invested capital was obtained through lawful means.

**B. USCIS's Processing and Denial**

39. On April 6, 2020, after nearly four years of processing, USCIS issued a Notice of Intent to Deny ("NOID") requesting additional evidence regarding:

a. Whether Plaintiff had placed her capital at risk as required by 8 C.F.R. § 204.6(j)(2); and

b. Whether the invested capital was obtained through lawful means, specifically citing 8 C.F.R. § 204.6(g)(1)'s requirement to account for "the lawful source(s) of all non-EB5 capital invested in the NCE."

40. Plaintiff timely responded to the NOID with comprehensive documentation addressing both concerns.

41. On July 23, 2020, USCIS denied the Petition, concluding that:

a. Plaintiff failed to demonstrate that her investment was irrevocably committed to the NCE; and

9

b. It remained unclear whether funds invested by non-EB-5 investors in the NCE derived from lawful sources.

42. The denial's second ground—requiring Plaintiff to prove the lawful source of other investors' funds—forms the basis of this action.

**C. Administrative Appeals**

43. Plaintiff timely filed a motion to reopen, which the USCIS dismissed on May 11, 2021, without addressing the fundamental legal issue.

44. Plaintiff appealed to the AAO, which dismissed the appeal on June 16, 2022. The AAO stated that Plaintiff "was required to identify the sources of all capital invested in the NCE **by other investors** and show the invested capital derived from lawful means as required by 8 C.F.R. section 204.6(g)(1)." (Emphasis added) (**Exhibit A**).

45. Notably, the AAO added the phrase "**by other investors**" to its interpretation of the regulation—language that appears nowhere in the actual text of 8 C.F.R. § 204.6(g)(1). This misstatement of the regulatory requirement constitutes the core legal error challenged in this action.

46. Plaintiff filed a motion to reconsider, specifically challenging the agency's interpretation of "capital" and arguing that 8 C.F.R. § 204.6(g)(1) applies only to EB-5 investors' own capital. The AAO dismissed this motion on January 31, 2023, adhering to its erroneous interpretation.

**D. USCIS's Inconsistent Application**

1    47. Critical to this action, USCIS has applied this interpretation inconsistently.

2    Another EB-5 investor who invested in the same NCE after Plaintiff filed her petition

3    received approval in 2018 without being required to prove the lawful source of other

4    investors' funds.

5    48. This disparate treatment demonstrates that USCIS's interpretation is not

6    only erroneous but also arbitrarily applied.

7    49. Even more tellingly, while USCIS demanded that Plaintiff prove the lawful

8    source of funds for non-EB-5 investors in the NCE, the agency never required

9    Plaintiff to prove that the two other EB-5 petitioners' funds were derived from lawful

10    means. This selective enforcement reveals that even USCIS recognizes the

11    impracticality of its interpretation.

12    50. The non-EB-5 investors whose funds USCIS demands Plaintiff verify are

13    U.S. citizens making domestic investments in a U.S. business. These U.S. citizen

14    investors are not subject to any federal requirement to prove the lawful source of their

15    investment funds when making ordinary domestic investments. Yet USCIS requires

16    Plaintiff—a foreign national with no legal authority over these U.S. citizens—to

17    somehow obtain and verify their private financial information.

18    **E. USCIS's Published Guidance on "Capital"**

19    51. USCIS's own published guidance comprehensively defines what qualifies

20    as "capital" under the EB-5 program. The agency states: "Capital means cash and all

21    real, personal, or mixed tangible assets owned and controlled by the immigrant

22    investor." (**Exhibit F**).

11

52. USCIS's "Capital Investment Requirements" guidance provides an exhaustive list of what does NOT qualify as capital:

"The definition of capital does not include:

- Assets acquired, directly or indirectly, by unlawful means (such as criminal activities);

- Capital invested in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the immigrant investor and the new commercial enterprise;

- Capital invested with a guaranteed rate of return on the amount invested; or

- Capital invested that is subject to any agreement between the immigrant investor and the new commercial enterprise that provides the immigrant investor with a contractual right to repayment..."

Note: Immigrant investors must establish that they are the legal owner of the capital invested." (**Exhibit F**).

53. USCIS further clarifies that "The immigrant investor must demonstrate by a preponderance of the evidence that the capital invested...was obtained through lawful means... In establishing that the capital was acquired through lawful means, the immigrant investor must provide evidence demonstrating the direct and indirect source of **his or her investment capital**." (Emphasis added) (**Exhibit F**).

54. In a 2019 Federal Register commentary, USCIS stated that an EB-5 petition "must be supported by evidence that the **foreign national's lawfully obtained capital**

is invested" in the new commercial enterprise. 84 Fed. Reg. 35750, 35757 (July 24, 2019) (**Exhibit G**).

55. Significantly, USCIS's own Policy Manual acknowledges that Congress has only "similarly defined" capital in the 2022 statute when compared to the pre-2022 regulatory definition—an admission that the definitions are not identical (**Exhibit F**).

**F. Practical Impossibility of Compliance**

56. USCIS's interpretation creates a practical impossibility of compliance. The Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401 et seq., prohibits financial institutions from disclosing customers' financial information without following specific procedures and providing notice.

57. Plaintiff, as a private individual and foreign national, has no legal authority to compel U.S. citizens or other investors to provide their confidential financial information.

58. The absurdity is heightened by the fact that these U.S. citizen investors face no obligation under U.S. law to document or prove the lawful source of their funds when making domestic investments. USCIS thus demands that a foreign national obtain information that U.S. citizens themselves are not required to maintain or disclose for their ordinary business investments.

59. If USCIS's interpretation were correct, it would create an absurd result in regional center projects. In a project with 100 EB-5 investors, each petitioner would need to obtain and verify the financial information of all 99 other petitioners, creating a circular impossibility where no petition could be approved.

**G. Missed Visa Availability Opportunities Due to Administrative Delay**

60. Plaintiff's investment capital has remained continuously at risk since August 2016, a period exceeding nine years as of the filing of this Amended Complaint.

61. The investment project has successfully created the requisite number of qualifying jobs as required under the EB-5 program.

62. During multiple periods between 2021 and 2022, the U.S. Department of State's Visa Bulletin indicated that the Final Action Date (Chart A) for China-born EB-5 applicants was "Current," specifically:

 – December 2021 through May 2022

63. Had USCIS properly adjudicated Plaintiff's I-526 petition during these periods of visa availability, Plaintiff would have been eligible to file Form I-485, obtain conditional permanent residence, and complete the required two-year sustainment period.

64. Based on the timeline above, had Plaintiff obtained conditional permanent residence during the December 2021–May 2022 window, Plaintiff would have been eligible to file Form I-829 by December 2023–May 2024 and could have achieved full permanent residence by now.

65. As a result of USCIS's erroneous denial and the associated delay, Plaintiff was deprived of the opportunity to benefit from the periods of visa availability described above.

66. Even if USCIS were to approve Plaintiff's I-526 petition now, Plaintiff would be required to begin a new two-year conditional permanent residence period, despite

14

having maintained capital at risk for over nine years and having already satisfied the statutory job creation requirements.

67. This outcome effectively penalizes Plaintiff for USCIS's administrative delay and erroneous adjudication, requiring duplicative proof of sustained investment and job creation.

**STANDARD OF REVIEW**

68. Under 5 U.S.C. § 706, this Court must determine whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Court must also independently interpret questions of statutory and regulatory meaning without deference to the agency's interpretation.

69. Under 5 U.S.C. § 706(2), this Court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

70. Plaintiff acknowledges that this action is subject to review under the APA and is ordinarily limited to the administrative record. However, because the agency's legal error is evident on the face of the denial and does not rely on disputed facts, judicial review is appropriate even absent formal production of the complete administrative record. The central issue—whether USCIS may require EB-5 petitioners to prove the lawful source of funds invested by non-petitioning investors—presents a pure question of legal interpretation, not a factual dispute.

71. The AAO's denial letter itself demonstrates the legal error, explicitly stating that Plaintiff was required to "identify the sources of all capital invested in the NCE

by other investors"—a requirement that appears nowhere in the governing statute or regulations. This fundamental misinterpretation of law requires no further factual development to resolve.

72. Plaintiff's claims rest on legal error apparent on the face of the denial. Accordingly, resolution is appropriate even in the absence of a full administrative record. The Court need only compare the regulatory text with USCIS's stated interpretation to determine that the agency has exceeded its statutory authority.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

## (Agency Action Contrary to Law and in Excess of Statutory Authority)

73. Plaintiff realleges and incorporates by reference paragraphs 1 through 64.

74. USCIS's interpretation of 8 C.F.R. § 204.6(g)(1) as requiring EB-5 petitioners to prove the lawful source of funds invested by other, non-petitioning investors is contrary to law and must be set aside under 5 U.S.C. § 706(2)(A).

75. The plain language of 8 C.F.R. § 204.6(e) defines "capital" as assets "owned by the alien investor." This definition necessarily excludes assets owned by other investors.

76. The requirement in 8 C.F.R. § 204.6(g)(1) that "the source(s) of all capital invested is identified and all invested capital has been derived by lawful means" must be read in conjunction with the regulatory definition of "capital." Properly interpreted, this provision requires identification only of capital owned by the petitioning investor.

77. USCIS's comprehensive guidance confirms this interpretation. The agency defines capital as assets "owned and controlled by the immigrant investor" and consistently uses singular possessive language ("his or her investment capital") when describing the lawful source requirement. The agency's exhaustive list of capital exclusions—which includes even the petitioner's own assets when subject to certain arrangements—conspicuously omits any mention of other investors' funds. If assets subject to debt arrangements are excluded from "capital," then assets not owned by the petitioner at all are a fortiori excluded.

78. USCIS's addition of the phrase "by other investors" to the regulatory text exceeds the agency's authority and violates fundamental principles of administrative law.

79. Recent judicial precedent directly supports this interpretation. In *Battineni v. Mayorkas, No. 22-cv-1332 (D.D.C. Oct. 2, 2024)*, Judge Paul L. Friedman addressed the scope of the lawful source requirement under the EB-5 program. The court held that "the EB-5 regulations require investors to demonstrate the legality of the immediate source of their investment funds" but that "there is no regulatory requirement to trace the funds back to their most remote origin." Significantly, the court rejected USCIS's long-standing interpretation of the "path of funds" requirement, finding that the agency's insistence on exhaustive tracing beyond what was reasonably documented exceeded legal standards. The court warned that USCIS's approach "risks conflating lawful-source verification with exhaustive tracing that is not explicitly required by EB-5 statutes."

17

1    80. The *Battineni* decision is particularly instructive here. In that case, the court

2    found USCIS acted arbitrarily by demanding excessive documentation to trace the

3    petitioner's own funds beyond their immediate source. Here, USCIS goes even further

4    by demanding that Plaintiff document the source of funds that belong to entirely

5    different investors—funds over which Plaintiff has no ownership, control, or legal

6    right to access. If USCIS cannot lawfully require a petitioner to trace their own funds

7    to remote origins, as *Battineni* held, it certainly cannot require a petitioner to trace

8    other people's funds at all. This represents an even more fundamental departure from

9    the regulatory text, which only addresses capital "owned by the alien investor."

10    81. Even if 8 C.F.R. § 204.6(g)(1) were deemed ambiguous, under *Loper*

11    *Bright Enterprises v. Raimondo, 603 U.S. ___ (2024)*, this Court must exercise

12    independent judgment in determining whether USCIS has acted within its statutory

13    authority, without deference to the agency's interpretation.

14    82. The EB-5 Reform and Integrity Act of 2022's clarification of "capital" as

15    assets "owned and controlled by the investor" confirms that Congress never intended

16    to require petitioners to verify the source of other investors' funds.

17    83. USCIS's interpretation leads to absurd results that Congress could not have

18    intended, as detailed in paragraphs 54-56 above.

19    84. If USCIS's interpretation constitutes a new substantive rule, the agency

20    violated 5 U.S.C. § 553 by failing to engage in notice-and-comment rulemaking.

21    85. USCIS's action is therefore arbitrary, capricious, an abuse of discretion, and

22    contrary to law.

18

1      **WHEREFORE**, as to Count I, Plaintiff respectfully requests that the Court

2  grant the relief described in the Prayer for Relief section below.

3      **COUNT II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

4      **(Arbitrary and Capricious Agency Action)**

5      86. Plaintiff realleges and incorporates by reference paragraphs 1 through 77.

6      87. USCIS's denial of Plaintiff's petition based on her failure to prove the

7  lawful source of other investors' funds is arbitrary and capricious under 5 U.S.C. §

8  706(2)(A).

9      88. As detailed in paragraphs 46-48, USCIS has applied its interpretation

10  inconsistently, approving other petitioners investing in the same NCE without

11  requiring proof of non-EB-5 investors' funds.

12      89. This disparate treatment violates the fundamental administrative law

13  principle that agencies must treat similarly situated parties consistently.

14      90. USCIS failed to provide a reasoned explanation for its departure from its

15  own published guidance detailed in paragraphs 49-53.

16      91. The agency's interpretation is arbitrary because it:

17      a. Contradicts USCIS's own published guidance limiting the requirement to

18  the petitioner's own capital;

19      b. Departs from USCIS's 2019 Federal Register interpretation;

20      c. Exceeds the regulatory limits established by the federal court in *Battineni*

21  *v. Mayorkas*, which rejected USCIS's expansive "path of funds" interpretation even

22  for a petitioner's own funds;

d. Imposes requirements that are practically impossible to fulfill; and

e. Creates irrational distinctions between similarly situated petitioners.

92. USCIS failed to consider important aspects of the problem, including the practical impossibility detailed in paragraphs 54-56, its own inconsistent application detailed in paragraph 48, and the judicial warnings in *Battineni* against conflating lawful-source verification with exhaustive tracing not required by statute.

93. The agency's action is therefore arbitrary, capricious, and an abuse of discretion.

**WHEREFORE**, as to Count II, Plaintiff respectfully requests that the Court grant the relief described in the Prayer for Relief section below.

## COUNT III: VIOLATION OF THE FIFTH AMENDMENT

### (Due Process)

94. Plaintiff realleges and incorporates by reference paragraphs 1 through 85.

95. The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law.

96. USCIS's interpretation of the capital requirement is unconstitutionally vague because it fails to provide fair notice of what is required for compliance.

97. Neither the statute nor the regulations explicitly state that EB-5 petitioners must verify the source of funds for non-petitioning investors. This lack of clarity violates due process by failing to provide adequate notice of the agency's requirements.

98. The agency violated Plaintiff's procedural due process rights by:

a. Applying an interpretation that departs from published guidance without fair notice;

b. Denying the petition based on requirements not clearly stated in law or regulation; and

c. Failing to provide a meaningful opportunity to address the agency's concerns given the impossibility of compliance.

99. USCIS's arbitrary enforcement and inconsistent application of its interpretation further violates due process by depriving Plaintiff of fair and impartial adjudication.

**WHEREFORE**, as to Count III, Plaintiff respectfully requests that the Court grant the relief described in the Prayer for Relief section below.

## COUNT IV: VIOLATION OF THE FIFTH AMENDMENT

### (Equal Protection)

100. Plaintiff realleges and incorporates by reference paragraphs 1 through 91.

101. The Equal Protection component of the Fifth Amendment's Due Process Clause requires the federal government to treat similarly situated individuals equally.

102. As detailed in paragraphs 46-48, USCIS violated equal protection by subjecting Plaintiff to requirements not imposed on other similarly situated EB-5 investors.

103. There is no rational basis for USCIS to treat Plaintiff differently from other EB-5 investors who were approved despite investing in the same new commercial enterprise.

104. This disparate treatment is arbitrary, unjustified by any legitimate government interest, and constitutes unconstitutional discrimination.

105. USCIS has failed to articulate any legitimate governmental interest served by applying its interpretation inconsistently among EB-5 petitioners investing in the same project.

**WHEREFORE**, as to Count IV, Plaintiff respectfully requests that the Court grant the relief described in the Prayer for Relief section below.

**COUNT V: EQUITABLE RELIEF (Remedy for Administrative Delay and Prejudice)**

106. Plaintiff realleges and incorporates by reference paragraphs 1 through 105.

107. As a direct result of USCIS's erroneous denial and unreasonable delay in adjudication, Plaintiff has been substantially prejudiced and deprived of the benefit of statutory provisions designed to provide a pathway to permanent residence.

108. Plaintiff has maintained her investment at risk for over nine years and has satisfied all substantive EB-5 requirements, including job creation, that would typically be evaluated during I-829 adjudication.

109. During the prolonged adjudication period, Final Action Dates for China-born EB-5 applicants were "Current" during the periods described in paragraphs 62-

64, providing opportunities for Plaintiff to have obtained conditional permanent residence had her petition been properly adjudicated. (**Exhibit H**)

110. Even if USCIS were to approve Plaintiff's I-526 petition now, she would be required to begin a new two-year conditional permanent residence period, despite having maintained her capital at risk for over nine years and having demonstrated sustained job creation.

111. This outcome effectively penalizes Plaintiff for USCIS's administrative delay and erroneous adjudication, requiring duplicative proof of sustained investment and job creation that has already been established over the extended investment period.

112. Requiring Plaintiff to undergo an additional two-year conditional permanent residence period would constitute manifest injustice given the prolonged investment period and demonstrated compliance with all EB-5 program requirements.[1]

113. Equity requires that Plaintiff receive the benefit of the bargain under the EB-5 program without additional delay caused by administrative inefficiency and

---

[1] The inequity of requiring Plaintiff to undergo additional sustainment is further highlighted by USCIS's October 11, 2023 guidance interpreting the EB-5 Reform and Integrity Act of 2022, which allows post-RIA investors (those who filed I-526 petitions on or after March 15, 2022) to sustain their investment for only two calendar years from the investment date, rather than through the full conditional residence period. This guidance is currently subject to litigation by Invest in the USA (IIUSA), which filed a federal lawsuit in March 2024 challenging USCIS's implementation of this policy change without proper notice-and-comment rulemaking. Regardless of the outcome of that litigation, USCIS's recognition that two years of sustainment may be sufficient for program compliance underscores the manifest injustice of requiring Plaintiff who has already sustained her investment for over nine years to undergo an additional two-year conditional residence period.

1  erroneous legal interpretation.

2  **WHEREFORE**, as to Count V, Plaintiff respectfully requests that the Court grant the

3  relief described in the Prayer for Relief section below.

4  **PRAYER FOR RELIEF**

5  WHEREFORE, Plaintiff respectfully requests that this Court:

6  1. Declare that USCIS may not require EB-5 petitioners to prove the lawful

7  source of capital invested by non-petitioning investors under 8 C.F.R. § 204.6(g)(1),

8  and that the regulation requires proof of lawful source only for capital invested by the

9  petitioner;

10  2. Declare that USCIS's interpretation of 8 C.F.R. § 204.6(g)(1) requiring

11  petitioners to verify other investors' funds is contrary to law, arbitrary and capricious,

12  and violates the Fifth Amendment;

13  3. Vacate and set aside the denial of Plaintiff's Form I-526 petition dated July

14  23, 2020, and all subsequent administrative decisions upholding that denial, including

15  the AAO decisions dated June 16, 2022, and January 31, 2023;

16  4. Order USCIS to approve Plaintiff's I-526 petition within thirty (30) days of

17  this Court's order;

18  5. In the alternative, remand the matter to USCIS with specific instructions that

19  the agency may not deny the petition based on Plaintiff's failure to document the

20  source of funds for investors other than herself;

21  6. In the interests of equity and to remedy the prejudice caused by

22  administrative delay, order that upon approval of the I-526 petition, USCIS shall

either:

(a) Credit Extended Sustainment**:** Recognize Plaintiff's nine-plus years of continuous capital investment and demonstrated job creation as satisfying the sustainment requirements typically evaluated during Form I-829 adjudication, thereby eliminating the need for conditional permanent residence; OR

(b) Waive or Modify CPR Period**:** Waive entirely or substantially shorten the standard two-year conditional permanent residence sustainment period to account for the prolonged investment period and missed opportunities for earlier adjustment of status;

7. Enjoin Defendants from applying the standard two-year conditional permanent residence requirements to Plaintiff in light of the extended investment period and demonstrated compliance with EB-5 program requirements;

8. Award Plaintiff her costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

9. Retain jurisdiction over this matter to ensure Defendants' compliance with the Court's order; and

10. Award such other and further relief as this Court deems just and proper.

Dated: August 12, 2025
Respectfully submitted,

*Xinyao Zhou*

XINYAO ZHOU
1885 Lundy Ave. Suite 108
San Jose, CA 95131
Phone: (513) 923-8698
Email: xinyao2012@gmail.com
Pro Se Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2025, I will serve a copy of this Complaint and all exhibits on the defendants through the appropriate channels as required by Fed. R. Civ. P. 4 and local rules.

*Xinyao Zhou*

XINYAO ZHOU

**INDEX OF EXHIBITS**

**Exhibit A:** Administrative Appeals Office Decision (June 16, 2022)

**Exhibit B:** Administrative Appeals Office Decision on Motion to Reconsider (January 31, 2023)

**Exhibit C:** 8USC§1153 – Allocation of immigrant visas

**Exhibit D:** 8CRF§204.6

**Exhibit E:** 8CRF§ 216.6

**Exhibit F:** USCIS Policy Manual - Chapter on EB-5 Capital Definition

**Exhibit G:** Federal Register, 84 Fed. Reg. 35750 (July 24, 2019)

**Exhibit H:** U.S. Department of State Visa Bulletin: Final Action Date Chart A for EB-5 China-Born Applicants (December 2021–May 2022)

Dated: August 12, 2025
Respectfully submitted,

_Xinyao Zhou_

XINYAO ZHOU
1885 Lundy Ave. Suite 108
San Jose, CA 95131
Phone: (513) 923-8698
Email: xinyao2012@gmail.com
Pro Se Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT A

 **U.S. Citizenship and Immigration Services**

**Non-Precedent Decision of the Administrative Appeals Office**

In Re: 20792326

Date: JUN. 16, 2022

Appeal of Immigrant Investor Program Office Decision

Form I-526, Immigrant Petition by Alien Entrepreneur

The Petitioner seeks classification as an immigrant investor pursuant to the Immigration and Nationality Act (the Act) section 203(b)(5), 8 U.S.C. § 1153(b)(5). This fifth preference (EB-5) classification makes immigrant visas available to foreign nationals who invest the requisite amount of qualifying capital in a new commercial enterprise (NCE) that will benefit the United States economy and create at least 10 full-time positions for qualifying employees.

The Chief of the Immigrant Investor Program Office denied the petition, concluding that the Petitioner did not establish eligibility for the EB-5 classification. Specifically, the Chief determined that the Petitioner did not establish she placed the required amount of capital at risk into Hotel Winters LLC, the NCE, as required by 8 C.F.R. § 204.6(j)(2) or show that the capital invested in the NCE derived from lawful sources as required by 8 C.F.R. § 204.6(g)(1). The Chief then affirmed her decision on a motion to reopen filed by the Petitioner. On appeal, the Petitioner maintains that she has shown eligibility for the EB-5 classification and submits new evidence.

In these proceedings, it is the Petitioner's burden to establish eligibility for the requested benefit. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AAO 2010). Upon de novo review, we will dismiss the appeal.

## I. LAW

A foreign national may be classified as an immigrant investor if he or she invests the requisite amount of qualifying capital in a NCE. The foreign national must show that his or her investment will benefit the United States economy and create at least 10 full-time jobs for qualifying employees. An immigrant investor may invest the required funds directly in an NCE, as in this case, or through a regional center. To be eligible for the EB-5 classification, a petitioner must show that he or she "has invested or is actively in the process of investing the required amount of capital" and "placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk." 8 C.F.R. § 204.6(j)(2). The regulation defines "invest" to mean "to contribute capital," and specifies that capital includes "cash, equipment, inventory, other tangible property," and "cash equivalents" but states that a contribution of capital "in exchange for a note, bond, convertible debt, obligation, or any

other debt arrangement between the immigrant investor and the [NCE] does not constitute a contribution of capital for the purposes of this part." 8 C.F.R. § 204.6(e).

The USCIS Policy manual[1] provides additional guidance on debt arrangements involving "redemption language" stating:

> Any agreement between the immigrant investor and the new commercial enterprise that provides the investor with a contractual right to repayment is an impermissible debt arrangement. In such a case, the investment funds do not constitute a qualifying contribution of capital.
>
> FN 20. *See Matter of Izummi*, 22 I&N Dec. 169, 188 (Assoc. Comm. 1998). *Matter of Izummi* addressed redemption agreements in general, and not only those where the investor holds the right to repayment. USCIS generally disfavors redemption provisions that indicate a preconceived intent to exit the investment as soon as possible, and notes that one district court has drawn the line at whether the investor holds the right to repayment. *See Chang v. USCIS*, 289 F.Supp.3d 177 (D.D.C. Feb. 7, 2018).

In addition, a petitioner must show that his or her invested capital did not derive, directly or indirectly, from unlawful means. 8 C.F.R. § 204.6(e). The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an immigrant investor even though there are several owners of the enterprise, including persons who are not seeking EB-5 classification provided that the source(s) of all capital invested is identified and all invested capital has been derived by lawful means. 8 C.F.R. § 204.6(g)(1).

## II. ANALYSIS

In this case, the Petitioner alleged that she invested $500,000 into the NCE on July 19, 2016.[2] According to the business plan, the NCE intends to develop and operate a hotel in Winters, California. On appeal, we withdraw the Chief's determination finding the Petitioner did not place her capital at risk but agree with the Chief's determination that the Petitioner did not identify the sources of all capital invested in the NCE or show that all the capital invested derived by lawful means.

## A. Capital at Risk

The Chief's decision questioned whether the Petitioner had entered into an impermissible debt arrangement by signing an operating agreement that included redemption provisions that indicated a preconceived intent to exit the investment as soon as possible and gave the Petitioner the right to repayment. In her decision to deny the petition, the Chief indicated the operating agreement made the Petitioner "legally able to (and possibly expect to) withdraw [her investment] at any time with the consent of the Manager." The Chief determined that the Petitioner had entered into an impermissible debt arrangement with the NCE and therefore had not placed her capital at risk as required under 8

---

[1] 6 *USCIS Policy Manual* G.2(A)(2), *available at*: https://www.uscis.gov/policy-manual.
[2] The Petitioner indicates that the NCE is located in a targeted employment area, and that the requisite amount of qualifying capital is downwardly adjusted from $1,000,000 to $500,000. See 8 C.F.R. § 204.6(f)(2).

C.F.R. § 204.6(j)(2). The Chief also determined that the Petitioner had not identified the sources of all capital invested in the NCE by other investors and had not shown the invested capital derived from lawful means as required by 8 C.F.R. § 204.6(g)(1).

On appeal, the Petitioner argues the provisions in Article 9 of the operating agreement do not contain the terms "redemption" or guarantee a buyer even if the NCE manager agrees to allow the sale. She also argues she had no intention to exercise any rights to transfer her shares in the NCE and did not attempt to sell her shares when the hotel appeared to be at risk of never being constructed.[3] The record includes an operating agreement that allows the Petitioner to sell her shares, with the consent of the NCE manager, to any third party after other members of the NCE have the right of first refusal. However, while the operating agreement allows the Petitioner to sell her shares at the price and terms she sets, there are no provisions in the operating agreement that indicate there is a guaranteed buyer. Here, since the record does not demonstrate the Petitioner had a preconceived intent to exit the investment as soon as possible with a right to repayment we will withdraw the Chief's determination that the Petitioner entered into an impermissible debt arrangement and therefore had not placed her capital at risk as required by 8 C.F.R. § 204.6(j)(2).

B. Lawful Source of Funds

The Petitioner's <u>initial</u> filing included records showing the NCE had a total of 12 other investors not seeking EB-5 classification. In response to the Chief's notice of intent to deny (NOID), the Petitioner provided an updated capital accounts and member registry showing the NCE had a total of 48 other investors including three investors seeking EB-5 classification with a total capital investment of $10,358,056. The Petitioner also provided a letter from the manager of the NCE stating all investors in the NCE had invested funds from lawful sources. In her motion to reopen filed with the Chief, the Petitioner provided another updated capital accounts and member registry document which indicated that as of January 2020, there were 50 other investors in the NCE including two seeking EB-5 classification. However, none of the documents in the record identify the sources of any of the funds invested in the NCE from other investors. Additionally, the letter from the manager of the NCE alleging all sources of funds invested in the NCE derived from lawful means is not sufficient to demonstrate, by a preponderance of the evidence, the lawful sources of the funds invested. The letter did not specifically identify the sources of the invested funds and is not supported by independent, objective evidence that would show the sources of invested funds derived from lawful sources. Here, we agree with the Chief's determination the Petitioner did not identify the sources of all capital invested in the NCE by other investors or show the invested capital derived from lawful means as required by 8 C.F.R. § 204.6(g)(1).

On appeal, the Petitioner argues a second EB-5 investor in the NCE received an approval and therefore her petition should be approved. However, we are not required to approve applications or petitions where eligibility has not been demonstrated, merely because of prior approvals that may have been erroneous. *See Matter of Church Scientology Int'l*, 19 I&N Dec. 593, 597 (Comm'r 1988); *see also Sussex Eng'g, Ltd. v. Montgomery*, 825 F.2d 1084, 1090 (6th Cir. 1987).

---

[3] The Petitioner also alleges in her appellate brief that her previous counsel did not notice the redemption provisions and mistakenly told the Petitioner all provisions complied with USCIS. However, to the extent the Petitioner alleges ineffective assistance of counsel she has not complied, either strictly or substantially, with the procedural requirements of *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), *aff'd*, 857 F.2d 10 (1st Cir. 1988).

Additionally, the Petitioner argues the Chief improperly weighed the evidence using a heightened standard of proof and claims her list of the age and occupation of other investors shows "there is a greater than 50% change [sic] that their investment funds are from lawful means." It is the Petitioner's burden to establish eligibility for the immigration benefit sought. Section 291 of the Act, 8 U.S.C. § 1361; *Matter of Otiende*, 26 I&N Dec. 127, 128 (BIA 2013); *Matter of Skirball Cultural Ctr.*, 25 I&N Dec. 799, 806 (AAO 2012); *Matter of Ho*, 19 I&N Dec. 582, 588-89 (BIA 1988); *Matter of Brantigan*, 11 I&N Dec. 493, 495 (BIA 1966); *Matter of D-Y-S-C-*, Adopted Decision 2019-02 (AAO Oct. 11, 2019). Except where a different standard is specified by law, a petitioner must prove eligibility for the requested immigration benefit by a preponderance of the evidence. *Chawathe*, 25 I&N at 375-76. Under the preponderance of the evidence standard, the evidence must demonstrate that the petitioner's claim is "probably true." *Id.* at 376. We will examine each piece of evidence for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true.

If a petitioner submits relevant, probative, and credible evidence that leads us to believe that the claim is "more likely than not" or "probably" true, she has satisfied the standard of proof. Stated another way, a petitioner must establish that there is greater than a fifty percent chance that a claim is true. We disagree with the Petitioner's contention that the Chief applied a heightened standard of proof. In this case, the Petitioner provided documents from the NCE listing the name of each investor as well as the amount of their capital contribution into the NCE. Later, the Petitioner provided the age and occupation of each investor. However, the Petitioner has not submitted evidence to establish that each investor's capital contribution derived from the income earned from their occupation. The Petitioner's unsupported conjecture regarding the source of the other investors' funds is not sufficient to establish the lawfulness of those funds under the preponderance of the evidence standard. . *Matter of Soffici*, 22 I&N Dec. 158, 165 (Comm. 1998) (simply going on the record without supporting documentation is not sufficient to meet the burden of proof in these proceedings).

Finally, the Petitioner argues she is unable to obtain evidence from other investors because she already invested her funds in the NCE and no longer had "bargain power to request for any financial files from other investors" and blames her former counsel for not informing her of this requirement.[4] The Petitioner's argument is not convincing, as at the time of filing her I-526, she was required to identify the sources of all capital invested in the NCE by other investors and show the invested capital derived from lawful means as required by 8 C.F.R. § 204.6(g)(1). As mentioned above, it is the Petitioner's burden to show, by a preponderance of the evidence, the lawful source of all funds invested in the NCE. Here, the Petitioner has failed to do so. As such, we find the Petitioner has not identified the sources of all capital invested in the NCE and has not shown the capital invested in the NCE derived from lawful sources. 8 C.F.R. § 204.6(g)(1).

## III. CONCLUSION

We withdraw the Chief's finding that the Petitioner had not placed her capital at risk as required by 8 C.F.R. § 204.6(j)(2). Based on the reasons stated above, we conclude that the Petitioner has not

---

[4] As mentioned above, to the extent the Petitioner alleges ineffective assistance of counsel she has not complied, either strictly or substantially, with the procedural requirements of *Lozada*, 19 I&N at 637.

identified the sources of all capital invested in the NCE and has not shown the capital invested in the NCE derived from lawful sources. 8 C.F.R. § 204.6(g)(1).

The appeal will be dismissed for the above stated reasons, with each considered as an independent and alternate basis for the decision. In visa petition proceedings, it is the petitioner's burden to establish eligibility for the immigration benefit sought. Section 291 of the Act, 8 U.S.C. § 1361; *Matter of Skirball Cultural Ctr.*, 25 I&N Dec. 799, 806 (AAO 2012). Here, that burden has not been met.

**ORDER:**    The appeal is dismissed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT B



**U.S. Citizenship and Immigration Services**

**Non-Precedent Decision of the
Administrative Appeals Office**

In Re: 23791790

Date: JAN. 31, 2023

Motion on Administrative Appeals Office Decision

Form I-526, Immigrant Petition by Alien Entrepreneur

The Petitioner seeks classification as an immigrant investor pursuant to the Immigration and Nationality Act (the Act) Section 203(b)(5), 8 U.S.C. § 1153(b)(5) (2016).[1]  This fifth preference (EB-5) classification makes immigrant visas available to noncitizens who invest the requisite amount of qualifying capital in a new commercial enterprise (NCE) that will benefit the United States economy and create at least 10 full-time positions for qualifying employees.

The Chief of the Immigrant Investor Program Office denied the petition, and subsequent motions.  We dismissed the Petitioner's appeal, finding that she did not sufficiently document "all invested capital [in⬚⬚⬚⬚⬚⬚⬚⬚⬚ LLC, the NCE,] has been derived by lawful means," as required under 8 C.F.R. § 204.6(g)(1) (2016).  The Petitioner has filed a motion to reconsider the matter.  On motion, the Petitioner maintains that we have "erred in understanding some material facts."

The Petitioner bears the burden of proof to demonstrate eligibility by a preponderance of the evidence. *Matter of Chawathe*, 25 I&N Dec. 369, 375-76 (AAO 2010).  Upon review, we will dismiss the motion to reconsider the matter.

## I. LAW

A motion to reconsider is based on an incorrect application of law or policy to the prior decision, and a motion to reopen is based on documentary evidence of new facts.  The requirements of a motion to reconsider are located at 8 C.F.R. § 103.5(a)(3), and the requirements of a motion to reopen are located at 8 C.F.R. § 103.5(a)(2).  We may grant a motion that satisfies these requirements and demonstrates eligibility for the requested immigration benefit.  In addition, by regulation, the scope of a motion is limited to "the prior decision."  8 C.F.R. § 103.5(a)(1)(i).

---

[1] On March 15, 2022, President Joseph Biden signed the EB-5 Reform and Integrity Act, which made significant amendments to the EB-5 program, including the designation of targeted employment areas and the minimum investment amounts. *See* Section 203(b)(5) of the Act, 8 U.S.C. § 1153(b)(5) (2022).

II. ANALYSIS

As discussed in our appellate decision, the Petitioner offered documents indicating that the NCE has multiple investors. In her motion filing to the Chief, the Petitioner presented a document entitled "[The NCE], Capital Accounts and Member Registry, Capital Accounts, 09-Jan-20" that lists 50 investors, both natural and non-natural persons, including three individuals who seek EB-5 classification. We explained on page 3 of our appellate decision that "none of the documents in the record identify the sources of any of the funds invested in the NCE from other investors" and that "the letter from the manager of the NCE alleging all sources of funds invested in the NCE derived from lawful means is not sufficient to demonstrate, by a preponderance of the evidence, the lawful sources of the funds invested."

On motion, the Petitioner argues that we erred in requiring her to show the lawful source of all investments in the NCE. Instead, she claims that under 8 C.F.R. § 204.6(g)(1) and the regulatory definition of "capital," she is only required to show the lawful source of her own invested funds. Specifically, she argues that under the regulatory definition, capital, as referenced in 8 C.F.R. § 204.6(g)(1), refers only to capital of individuals are seeking EB-5 classification; and as such, she asserts that she need not show the lawful source of investors who are not seeking EB-5 classification. *See* 8 C.F.R. § 204.6(e).

The plain language of the regulation does not support her contention. The regulation specifies:

> . . . The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien entrepreneur even though there are several owners of the enterprise, including persons who are not seeking [EB-5] classification . . . and non-natural persons, both foreign and domestic, provided that the source(s) of all capital invested is identified and all invested capital has been derived by lawful means.

8 C.F.R. § 204.6(g)(1). As illustrated above, the regulation specifically references investments from "persons who are not seeking [EB-5] classification" and then requires a showing that "all invested capital has been derived by lawful means." The plain language of the regulation does not support a finding that the Petitioner is required to document only the lawful source of her own funds.

Additionally, the regulation defines "capital" as "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness." 8 C.F.R. § 204.6(e). The definition references "alien entrepreneur" when discussing "indebtedness," but not when listing other forms of capital, including "cash, equipment, inventory, other tangible property, [and] cash equivalents." The language of the regulatory definition thus does not support the Petitioner's position that "capital," as referenced in 8 C.F.R. § 204.6(g)(1), only pertains to capital invested by those who seek EB-5 classification.

On motion, the Petitioner also states that "[i]t is not possible for [her] to vouch for the capital invested by other investors," because "it is not possible for [her] to obtain private and confidential financial information about all investors in the project." Notwithstanding her claims, the regulatory requirement

is that she must document "the source(s) of all capital invested," showing that "all invested capital has been derived by lawful means." 8 C.F.R. § 204.6(g)(1). The Petitioner's purported inability to offer sufficient supporting evidence does not eliminate this requirement. As noted in our appellate decision, "[i]t is the Petitioner's burden to establish eligibility for the immigration benefit sought." *See Matter of Chawathe*, 25 I&N Dec. at 375-76; *see also* 8 C.F.R. § 103.2(b)(2)(i) (stating that "[t]he non-existence or other unavailability of required evidence creates a presumption of ineligibility").

The Petitioner argues on motion, as she did on appeal, that U.S. Citizenship and Immigration Services (USCIS) should approve her petition, because it approved the petition of one of the NCE's other investors. As explained in our appellate decision, "we are not required to approve applications or petitions where eligibility has not been demonstrated, merely because of prior approvals that may have been erroneous."[2] *See Matter of Church Scientology Int'l*, 19 I&N Dec. 593, 597 (Comm'r 1988); *see also Sussex Eng'g, Ltd. v. Montgomery*, 825 F.2d 1084, 1090 (6th Cir. 1987). Furthermore, we are not bound to follow a contradictory decision of the Chief. *La. Philharmonic Orchestra v. INS*, No. 98-2855, 2000 WL 282785, at *3 (E.D. La. 2000), *aff'd*, 248 F.3d 1139 (5th Cir. 2001); *see generally* 6 *USCIS Policy Manual* G.6, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-6 (noting "USCIS will . . . conduct a de novo review of each prospective immigrant investor's lawful source of funds and other individualized eligibility criteria").[3]

Based on these reasons, we will dismiss the motion to reconsider the matter because the Petitioner has not shown that our appellate decision was based on an incorrect application of law or USCIS policy or was incorrect based on the evidence before us when we issued the decision. *See* 8 C.F.R. § 103.5(a)(3).[4]

**ORDER:**     The motion to reconsider is dismissed.

---

[2] Additionally, we note that our adjudication is limited to the matter before us, and the record before us does not establish the Petitioner's eligibility.

[3] On motion the Petitioner expresses, as she did on appeal, her dissatisfaction with the management of the NCE and the services she received from her prior counsel. A motion filing, however, is not the proper mechanism to voice and redress these issues. Additionally, as noted in our appellate decision, "to the extent the Petitioner alleges ineffective assistance of counsel, she has not complied, either strictly or substantially, with the procedural requirements of *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), *aff'd*, 857 F.2d 10 (1st Cir. 1988)."

[4] While the Petitioner has offered additional materials on motion, she has not filed a motion to reopen the proceeding. *See* 8 C.F.R. § 103.5(a)(2). As such, we consider the materials only as support for her motion to reconsider and conclude that they do not satisfy the motion to reconsider requirements.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT C

[Print]   [Print selection]                                                      [OLRC Home]  Help

subparagraph (A) or (B) thereof), or which not more than 5,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 1101(a)(27)(C)(ii) of this title, and not more than 100 may be made available in any fiscal year to special immigrants, excluding spouses and children, who are described in section 1101(a)(27)(M) of this title.

**(5) Employment creation**

**(A) In general**

Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership)-

(i) in which such alien has invested (after November 29, 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C) and which is expected to remain invested for not less than 2 years; and

(ii) which will benefit the United States economy by creating full-time employment for not fewer than 10 United States citizens, United States nationals, or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

**(B) Designations and reserved visas**

**(i) Reserved visas**

**(I) In general**

Of the visas made available under this paragraph in each fiscal year-

(aa) 20 percent shall be reserved for qualified immigrants who invest in a rural area;

(bb) 10 percent shall be reserved for qualified immigrants who invest in an area designated by the Secretary of Homeland Security under clause (ii) as a high unemployment area; and

(cc) 2 percent shall be reserved for qualified immigrants who invest in infrastructure projects.

**(II) Unused visas**

**(aa) Carryover**

At the end of each fiscal year, any unused visas reserved for qualified immigrants investing in each of the categories described in items (aa) through (cc) of subclause (I) shall remain available within the same category for the immediately succeeding fiscal year.

**(bb) General availability**

Visas described in items (aa) through (cc) of subclause (I) that are not issued by the end of the succeeding fiscal year referred to in item (aa) shall be made available to qualified immigrants described under subparagraph (A).

**(ii) Designation of high unemployment area**

**(I) In general**

The Secretary of Homeland Security, or a designee of the Secretary who is an employee of the Department of Homeland Security, may designate, as a high unemployment area, a census tract, or contiguous census tracts, in which-

(aa) the new commercial enterprise is principally doing business; and

(bb) the weighted average of the unemployment rate for the census tracts, based on the labor force employment measure for each applicable census tract and any adjacent tract included under subclause (III), is not less than 150 percent of the national average unemployment rate.

**(II) Prohibition on designation by any other official**

A targeted employment area may not be designated as a high unemployment area by-

(aa) a Federal official other than the Secretary of Homeland Security or a designee of the

written agreement between or among such entities and each direct or third-party promoter operating on behalf of such entities that outlines the rules and standards prescribed under clause (i).

**(iv) Disclosure**

Each petition filed under section 1154(a)(1)(H) of this title shall include a disclosure, signed by the investor, that reflects all fees, ongoing interest, and other compensation paid to any person that the regional center or new commercial enterprise knows has received, or will receive, in connection with the investment, including compensation to agents, finders, or broker dealers involved in the offering, to the extent not already specifically identified in the business plan filed under subparagraph (F).

**(L) Source of funds**

**(i) In general**

An alien investor shall demonstrate that the capital required under subparagraph (A) and any funds used to pay administrative costs and fees associated with the alien's investment were obtained from a lawful source and through lawful means.

**(ii) Required information**

The Secretary of Homeland Security shall require that an alien investor's petition under this paragraph contain, as applicable-

(I) business and tax records, or similar records, including-

(aa) foreign business registration records;

(bb) corporate or partnership tax returns (or tax returns of any other entity in any form filed in any country or subdivision of such country), and personal tax returns, including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind, filed during the past 7 years (or another period to be determined by the Secretary to ensure that the investment is obtained from a lawful source of funds) with any taxing jurisdiction within or outside the United States by or on behalf of the alien investor; and

(cc) any other evidence identifying any other source of capital or administrative fees;

(II) evidence related to monetary judgments against the alien investor, including certified copies of any judgments, and evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving possible monetary judgments against the alien investor from any court within or outside the United States; and

(III) the identity of all persons who transfer into the United States, on behalf of the investor, any funds that are used to meet the capital requirement under subparagraph (A).

**(iii) Gift and loan restrictions**

**(I) In general**

Gifted and borrowed funds may not be counted toward the minimum capital investment requirement under subparagraph (C) unless such funds-

(aa) were gifted or loaned to the alien investor in good faith; and

(bb) were not gifted or loaned to circumvent any limitations imposed on permissible sources of capital under this subparagraph, including but not limited to proceeds from illegal activity.

**(II) Records requirement**

If funds invested under subparagraph (A) are gifted or loaned to the alien investor, the Secretary shall require that the alien investor's petition under this paragraph includes the records described in subclauses (I) and (II) of clause (ii) from the donor or, if other than a bank, the lender.

**(M) Treatment of good faith investors following program noncompliance**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT D

This content is from the eCFR and is authoritative but unofficial.

---

📅 Displaying title 8, up to date as of 5/29/2025. Title 8 was last amended 5/18/2025. ❓

---

Title 8—Aliens and Nationality
Chapter I—Department of Homeland Security
Subchapter B—Immigration Regulations
Part 204—Immigrant Petitions
Subpart A—Immigrant Visa Petitions

§ 204.6 Petitions for employment creation immigrants.

(a) *General.* An EB-5 immigrant petition to classify an alien under section 203(b)(5) of the Act must be properly filed in accordance with the form instructions, with the appropriate fee(s), initial evidence, and any other supporting documentation.

(b) [Reserved]

(c) *Eligibility to file and continued eligibility.* An alien may file a petition for classification as an investor on his or her own behalf.

(d) *Priority date.* The priority date of a petition for classification as an investor is the date the completed, signed petition (including all initial evidence and the correct fee) is properly filed. The priority date of an immigrant petition approved for classification as an investor, including immigrant petitions whose approval was revoked on grounds other than those set forth below, will apply to any subsequently filed petition for classification under section 203(b)(5) of the Act for which the alien qualifies. A denied petition will not establish a priority date. A priority date is not transferable to another alien. In the event that the alien is the petitioner of multiple immigrant petitions approved for classification as an investor, the alien shall be entitled to the earliest qualifying priority date. The priority date of an immigrant petition approved for classification as an investor shall not be conferred to a subsequently filed petition if the alien was lawfully admitted to the United States for permanent residence under section 203(b)(5) of the Act using the priority date of the earlier-approved petition or if at any time USCIS revokes the approval of the petition based on:

   (1) Fraud or a willful misrepresentation of a material fact by the petitioner; or

   (2) A determination by USCIS that the petition approval was based on a material error.

(e) *Definitions.* As used in this section:

   *Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien investor, provided that the alien investor is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness. All capital shall be valued at fair market value in United States dollars. Assets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital for the purposes of section 203(b)(5) of the Act.

   *Commercial enterprise* means any for-profit activity formed for the ongoing conduct of lawful business including, but not limited to, a sole proprietorship, partnership (whether limited or general), holding company, joint venture, corporation, business trust, or other entity which may be publicly or privately owned. This definition includes a commercial enterprise consisting of a holding company and its wholly-owned subsidiaries, provided that each such subsidiary is engaged in a for-profit activity formed for the ongoing conduct of a lawful business. This definition shall not include a noncommercial activity such as owning and operating a personal residence.

   *Employee* means an individual who provides services or labor for the new commercial enterprise and who receives wages or other remuneration directly from the new commercial enterprise. In the case of the Regional Center Program, "employee" also means an individual who provides services or labor in a job which has been created indirectly through investment in the new commercial enterprise. This definition shall not include independent contractors.

   *Full-time employment* means employment of a qualifying employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week. In the case of the Regional Center Program, "full-time employment" also means employment of a qualifying employee in a position that has been created indirectly through revenues generated from increased exports resulting from the Regional Center Program that requires a minimum of 35 working hours per week. A job-sharing arrangement whereby two or more qualifying employees

share a full-time position shall count as full-time employment provided the hourly requirement per week is met. This definition shall not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

*High employment area* means a part of a metropolitan statistical area that at the time of investment:

(i) Is not a targeted employment area; and

(ii) Is an area with an unemployment rate significantly below the national average unemployment rates.

*Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien investor and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part.

*New* means established after November 29, 1990.

*Qualifying employee* means a United States citizen, a lawfully admitted permanent resident, or other immigrant lawfully authorized to be employed in the United States including, but not limited to, a conditional resident, a temporary resident, an asylee, a refugee, or an alien remaining in the United States under suspension of deportation. This definition does not include the alien investor, the alien investor's spouse, sons, or daughters, or any nonimmigrant alien.

*Regional center* means any economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

*Regional Center Program* means the program established by Public Law 102-395, Section 610, as amended.

*Rural area* means any area other than an area within a standard metropolitan statistical area (as designated by the Office of Management and Budget) or within the outer boundary of any city or town having a population of 20,000 or more based on the most recent decennial census of the United States.

*Targeted employment area* means an area that, at the time of investment, is a rural area or is designated as an area that has experienced unemployment of at least 150 percent of the national average rate.

*Troubled business* means a business that has been in existence for at least two years, has incurred a net loss for accounting purposes (determined on the basis of generally accepted accounting principles) during the twelve- or twenty-four month period prior to the priority date on the alien investor's EB-5 immigrant petition, and the loss for such period is at least equal to twenty percent of the troubled business's net worth prior to such loss. For purposes of determining whether or not the troubled business has been in existence for two years, successors in interest to the troubled business will be deemed to have been in existence for the same period of time as the business they succeeded.

(f) *Required amounts of capital* —

(1) *General.* Unless otherwise specified, for EB-5 immigrant petitions filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in the United States is one million eight hundred thousand United States dollars ($1,800,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, based on the cumulative annual percentage change in the unadjusted All Items Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average reported by the Bureau of Labor Statistics, as compared to $1,000,000 in 1990. The qualifying investment amount will be rounded down to the nearest hundred thousand. DHS may update this figure by publication of a technical amendment in the FEDERAL REGISTER.

(2) *Targeted employment area.* Unless otherwise specified, for EB-5 immigrant petitions filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in a targeted employment area in the United States is nine hundred thousand United States dollars ($900,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, to be equal to 50 percent of the standard minimum investment amount described in paragraph (f)(1) of this section. DHS may update this figure by publication of a technical amendment in the FEDERAL REGISTER.

(3) *High employment area.* Unless otherwise specified, for EB-5 immigrant petitions filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in a high employment area in the United States is one million eight hundred thousand United States dollars ($1,800,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, based on the cumulative annual percentage change in the unadjusted All Items Consumer Price Index for All

Urban Consumers (CPI-U) for the U.S. City Average reported by the Bureau of Labor Statistics as compared to $1,000,000 in 1990. The qualifying investment amount will be rounded down to the nearest hundred thousand. DHS may update this figure by publication of a technical amendment in the FEDERAL REGISTER.

(g) *Multiple investors —*

(1) *General.* The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien investor by more than one investor, provided each petitioning investor has invested or is actively in the process of investing the required amount for the area in which the new commercial enterprise is principally doing business, and provided each individual investment results in the creation of at least ten full-time positions for qualifying employees. The establishment of a new commercial enterprise may be used as the basis of a petition for classification as an alien investor even though there are several owners of the enterprise, including persons who are not seeking classification under section 203(b)(5) of the Act and non-natural persons, both foreign and domestic, provided that the source(s) of all capital invested is identified and all invested capital has been derived by lawful means.

(2) *Employment creation allocation.* The total number of full-time positions created for qualifying employees shall be allocated solely to those alien investors who have used the establishment of the new commercial enterprise as the basis for a petition. No allocation must be made among persons not seeking classification under section 203(b)(5) of the Act or among non-natural persons, either foreign or domestic. USCIS will recognize any reasonable agreement made among the alien investors in regard to the identification and allocation of such qualifying positions.

(h) *Establishment of a new commercial enterprise.* The establishment of a new commercial enterprise may consist of:

(1) The creation of an original business;

(2) The purchase of an existing business and simultaneous or subsequent restructuring or reorganization such that a new commercial enterprise results; or

(3) The expansion of an existing business through the investment of the required amount, so that a substantial change in the net worth or number of employees results from the investment of capital. Substantial change means a 40 percent increase either in the net worth, or in the number of employees, so that the new net worth, or number of employees amounts to at least 140 percent of the pre-expansion net worth or number of employees. Establishment of a new commercial enterprise in this manner does not exempt the petitioner from the requirements of 8 CFR 204.6(j) (2) and (3) relating to the required amount of capital investment and the creation of full-time employment for ten qualifying employees. In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 CFR 204.6(j)(4)(ii).

(i) *Special designation of a high unemployment area.* USCIS may designate as an area of high unemployment (at least 150 percent of the national average rate) a census tract or contiguous census tracts in which the new commercial enterprise is principally doing business, and may also include any or all census tracts directly adjacent to such census tract(s). The weighted average of the unemployment rate for the subdivision, based on the labor force employment measure for each census tract, must be at least 150 percent of the national average unemployment rate.

(j) *Initial evidence to accompany petition.* A petition submitted for classification as an alien entrepreneur must be accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees. In the case of petitions submitted under the Immigrant Investor Pilot Program, a petition must be accompanied by evidence that the alien has invested, or is actively in the process of investing, capital obtained through lawful means within a regional center designated by the Service in accordance with paragraph (m)(4) of this section. The petitioner may be required to submit information or documentation that the Service deems appropriate in addition to that listed below.

(1) To show that a new commercial enterprise has been established by the petitioner in the United States, the petition must be accompanied by:

(i) As applicable, articles of incorporation, certificate of merger or consolidation, partnership agreement, certificate of limited partnership, joint venture agreement, business trust agreement, or other similar organizational document for the new commercial enterprise;

(ii) A certificate evidencing authority to do business in a state or municipality or, if the form of the business does not require any such certificate or the State or municipality does not issue such a certificate, a statement to that effect; or

(iii) Evidence that, as of a date certain after November 29, 1990, the required amount of capital for the area in which an enterprise is located has been transferred to an existing business, and that the investment has resulted in a substantial increase in the net worth or number of employees of the business to which the capital was transferred. This evidence must be in the form of stock purchase agreements, investment agreements, certified financial reports, payroll records, or any similar instruments, agreements, or documents evidencing the investment in the commercial enterprise and the resulting substantial change in the net worth, number of employees.

(2) To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital. Such evidence may include, but need not be limited to:

  (i) Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

  (ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

  (iii) Evidence of property transferred from abroad for use in the United States enterprise, including U.S. Customs and Border Protection commercial entry documents, bills of lading, and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

  (iv) Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred). Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

  (v) Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

(3) To show that the petitioner has invested, or is actively in the process of investing, capital obtained through lawful means, the petition must be accompanied, as applicable, by:

  (i) Foreign business registration records;

  (ii) Corporate, partnership (or any other entity in any form which has filed in any country or subdivision thereof any return described in this subpart), and personal tax returns including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind filed within five years, with any taxing jurisdiction in or outside the United States by or on behalf of the petitioner;

  (iii) Evidence identifying any other source(s) of capital; or

  (iv) Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the petitioner from any court in or outside the United States within the past fifteen years.

(4) *Job creation* —

  (i) *General.* To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:

    (A) Documentation consisting of photocopies of relevant tax records, Form I-9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or

    (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

  (ii) *Troubled business.* To show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than

the pre-investment level for a period of at least two years. Photocopies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan shall be submitted in support of the petition.

(iii) *Immigrant Investor Pilot Program.* To show that the new commercial enterprise located within a regional center approved for participation in the Immigrant Investor Pilot Program meets the statutory employment creation requirement, the petition must be accompanied by evidence that the investment will create full-time positions for not fewer than 10 persons either directly or indirectly through revenues generated from increased exports resulting from the Pilot Program. Such evidence may be demonstrated by reasonable methodologies including those set forth in paragraph (m)(3) of this section.

(5) *Petitioner engagement.* To show that the petitioner is or will be engaged in the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, the petition must be accompanied by:

(i) A statement of the position title that the petitioner has or will have in the new enterprise and a complete description of the position's duties;

(ii) Evidence that the petitioner is a corporate officer or a member of the corporate board of directors; or

(iii) Evidence that the petitioner is engaged in policy making activities. For purposes of this section, a petitioner will be considered sufficiently engaged in policy making activities if the petitioner is an equity holder in the new commercial enterprise and the organizational documents of the new commercial enterprise provide the petitioner with certain rights, powers, and duties normally granted to equity holders of the new commercial enterprise's type of entity in the jurisdiction in which the new commercial enterprise is organized.

(6) If applicable, to show that the new commercial enterprise has created or will create employment in a targeted employment area, the petition must be accompanied by:

(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within an area not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, nor within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, the county in which a city or town with a population of 20,000 or more is located, or the city or town with a population of 20,000 or more outside of a metropolitan statistical area, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of at least 150 percent of the national average rate; or

(B) A description of the boundaries and the unemployment statistics for the area for which designation is sought as set forth in paragraph (i) of this section, and the reliable method or methods by which the unemployment statistics were obtained.

(k) *Decision.* The petitioner will be notified of the decision, and, if the petition is denied, of the reasons for the denial. The petitioner has the right to appeal the denial to the Administrative Appeals Office in accordance with the provisions of part 103 of this chapter.

(l) [Reserved]

(m) *Immigrant Investor Pilot Program —*

(1) *Scope.* The Immigrant Investor Pilot Program is established solely pursuant to the provisions of section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, and subject to all conditions and restrictions stipulated in that section. Except as provided herein, aliens seeking to obtain immigration benefits under this paragraph continue to be subject to all conditions and restrictions set forth in section 203(b)(5) of the Act and this section.

(2) *Number of immigrant visas allocated.* The annual allocation of the visas available under the Immigrant Investor Pilot Program is set at 300 for each of the five fiscal years commencing on October 1, 1993.

(3) *Requirements for regional centers.* Each regional center wishing to participate in the Immigrant Investor Pilot Program shall submit a proposal to the Assistant Commissioner for Adjudications, which:

(i) Clearly describes how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment;

(ii) Provides in verifiable detail how jobs will be created indirectly through increased exports;

(iii) Provides a detailed statement regarding the amount and source of capital which has been committed to the regional center, as well as a description of the promotional efforts taken and planned by the sponsors of the regional center;

(iv) Contains a detailed prediction regarding the manner in which the regional center will have a positive impact on the regional or national economy in general as reflected by such factors as increased household earnings, greater demand for business services, utilities, maintenance and repair, and construction both within and without the regional center; and

(v) Is supported by economically or statistically valid forecasting tools, including, but not limited to, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and/or multiplier tables.

(4) *Submission of proposals to participate in the Immigrant Investor Pilot Program.* On August 24, 1993, the Service will accept proposals from regional centers seeking approval to participate in the Immigrant Investor Pilot Program. Regional centers that have been approved by the Assistant Commissioner for Adjudications will be eligible to participate in the Immigrant Investor Pilot Program.

(5) *Decision to participate in the Immigrant Investor Pilot Program.* The Assistant Commissioner for Adjudications shall notify the regional center of his or her decision on the request for approval to participate in the Immigrant Investor Pilot Program, and, if the petition is denied, of the reasons for the denial and of the regional center's right of appeal to the Associate Commissioner for Examinations. Notification of denial and appeal rights, and the procedure for appeal shall be the same as those contained in 8 CFR 103.3.

(6) ¹ *Continued participation requirements for regional centers.*

(i) Regional centers approved for participation in the program must:

(A) Continue to meet the requirements of section 610(a) of the Appropriations Act.

(B) Provide USCIS with updated information annually, and/or as otherwise requested by USCIS, to demonstrate that the regional center is continuing to promote economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area, using a form designated for this purpose; and

(C) Pay the fee provided by 8 CFR 106.2.

(ii) USCIS will issue a notice of intent to terminate the designation of a regional center in the program if:

(A) A regional center fails to submit the information required in paragraph (m)(6)(i)(B) of this section, or pay the associated fee; or

(B) USCIS determines that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

(iii) A notice of intent to terminate the designation of a regional center will be sent to the regional center and set forth the reasons for termination.

(iv) The regional center will be provided 30 days from receipt of the notice of intent to terminate to rebut the ground or grounds stated in the notice of intent to terminate.

(v) USCIS will notify the regional center of the final decision. If USCIS determines that the regional center's participation in the program should be terminated, USCIS will state the reasons for termination. The regional center may appeal the final termination decision in accordance with 8 CFR 103.3.

(vi) A regional center may elect to withdraw from the program and request a termination of the regional center designation. The regional center must notify USCIS of such election in the form of a letter or as otherwise requested by USCIS. USCIS will notify the regional center of its decision regarding the withdrawal request in writing.

(7) *Requirements for alien entrepreneurs.* An alien seeking an immigrant visa as an alien entrepreneur under the Immigrant Investor Pilot Program must demonstrate that his or her qualifying investment is within a regional center approved pursuant to paragraph (m)(4) of this section and that such investment will create jobs indirectly through revenues generated from increased exports resulting from the new commercial enterprise.

    (i) *Exports.* For purposes of paragraph (m) of this section, the term "exports" means services or goods which are produced directly or indirectly through revenues generated from a new commercial enterprise and which are transported out of the United States;

    (ii) *Indirect job creation.* To show that 10 or more jobs are actually created indirectly by the business, reasonable methodologies may be used. Such methodologies may include multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment.

(8) *Time for submission of petitions for classification as an alien entrepreneur under the Immigrant Investor Pilot Program.* Commencing on October 1, 1993, petitions will be accepted for filing and adjudicated in accordance with the provisions of this section if the alien entrepreneur has invested or is actively in the process of investing within a regional center which has been approved by the Service for participation in the Pilot Program.

(9) *Effect of termination of approval of regional center to participate in the Immigrant Investor Pilot Program.* Upon termination of approval of a regional center to participate in the Immigrant Investor Pilot Program, the director shall send a formal written notice to any alien within the regional center who has been granted lawful permanent residence on a conditional basis under the Pilot Program, and who has not yet removed the conditional basis of such lawful permanent residence, of the termination of the alien's permanent resident status, unless the alien can establish continued eligibility for alien entrepreneur classification under section 203(b)(5) of the Act.

(n) *Offering amendments or supplements.* Amendments or supplements to any offering necessary to maintain compliance with applicable securities laws based upon changes to this section effective on November 21, 2019 shall not independently result in denial or revocation of a petition for classification under section 203(b)(5) of the Act, provided that the petitioner:

    (1) Filed the petition for classification under section 203(b)(5) of the Act prior to November 21, 2019;

    (2) Was eligible for classification under 203(b)(5) of the Act at the time the petition was filed; and

    (3) Is eligible for classification under 203(b)(5) of the Act, including having no right to withdraw or rescind the investment or commitment to invest into such offering, at the time of adjudication of the petition.

[56 FR 60910, Nov. 29, 1991, as amended at 57 FR 1860, Jan. 16, 1992; 58 FR 44608, 44609, Aug. 24, 1993; 74 FR 26937, June 5, 2009; 75 FR 58990, Sept. 24, 2010; 76 FR 53782, Aug. 29, 2011; 81 FR 73332, Oct. 24, 2016; 84 FR 35808, July 24, 2019; 85 FR 46922, Aug. 3, 2020]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT E

demonstrates to USCIS' satisfaction that failure to file a timely petition was for good cause and due to extenuating circumstances. If the late petition is filed prior to jurisdiction vesting with the immigration judge in proceedings and USCIS excuses the late filing and approves the petition, USCIS shall restore the investor's permanent resident status, remove the conditional basis of such status, and cancel any outstanding notice to appear in accordance with 8 CFR 239.2. If the petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the investor and DHS.

(6) *Death of investor and effect on spouse and children.* If an investor dies during the prescribed 2-year period of conditional permanent residence, the spouse and children of the investor will be eligible for removal of conditions if it can be demonstrated that the conditions set forth in paragraph (a)(4) of this section have been met.

(b) *Petition review*—(1) *Authority to waive interview.* USCIS shall review the petition to remove conditions and the supporting documents to determine whether to waive the interview required by the Act. If satisfied that the requirements set forth in paragraph (c)(1) of this section have been met, USCIS may waive the interview and approve the petition. If not so satisfied, then USCIS may require that an interview of the investor be conducted.

(2) *Location of interview.* Unless waived, an interview relating to the petition to remove conditions for investors shall be conducted by a USCIS immigration officer at the office that has jurisdiction over either the location of the investor's commercial enterprise in the United States, the investor's residence in the United States, or the location of the adjudication of the petition, at the agency's discretion.

(3) *Termination of status for failure to appear for interview.* If the investor fails to appear for an interview in connection with the petition when requested by USCIS, the investor's permanent resident status will be automatically terminated as of the second anniversary of the date on which the investor obtained permanent residence. The in-

vestor will be provided with written notification of the termination and the reasons therefore, and a notice to appear shall be issued placing the investor in removal proceedings. The investor may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the investor to establish by a preponderance of the evidence that he or she complied with the interview requirements. If the investor has failed to appear for a scheduled interview, he or she may submit a written request to USCIS asking that the interview be rescheduled or that the interview be waived. That request should explain his or her failure to appear for the scheduled interview, and if a request for waiver of the interview, the reasons such waiver should be granted. If USCIS determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate. If USCIS waives the interview, USCIS shall restore the investor's conditional permanent resident status, cancel any outstanding notice to appear in accordance with 8 CFR 239.2, and proceed to adjudicate the investor's petition. If USCIS reschedules that investor's interview, USCIS shall restore the investor's conditional permanent resident status, and cancel any outstanding notice to appear in accordance with 8 CFR 239.2.

(c) *Adjudication of petition.* (1) The decision on the petition shall be made within 90 days of the date of filing or within 90 days of the interview, whichever is later. In adjudicating the petition, the director shall determine whether:

(i) [Reserved]

(ii) The alien invested or was actively in the process of investing the requisite capital; and

(iii) The alien sustained the actions described in paragraphs (c)(1)(i) and (c)(1)(ii) of this section throughout the period of the alien's residence in the United States. The alien will be considered to have sustained the actions required for removal of conditions if he or she has, in good faith, substantially met the capital investment requirement of the statute and continuously

**Department of Homeland Security** §217.2

maintained his or her capital invest-
ment over the two years of conditional
residence.

(iv) The alien created or can be ex-
pected to create within a reasonable
period of time ten full-time jobs to
qualifying employees. In the case of a
"troubled business" as defined in 8
CFR 204.6(j)(4)(ii), the alien maintained
the number of existing employees at no
less than the pre-investment level for
the previous two years.

(2) If derogatory information is deter-
mined regarding any of these issues or
it becomes known to the government
that the investor obtained his or her
investment funds through other than
legal means, USCIS shall offer the in-
vestor the opportunity to rebut such
information. If the investor fails to
overcome such derogatory information
or evidence that the investment funds
were obtained through other than legal
means, USCIS may deny the petition,
terminate the investor's permanent
resident status, and issue a notice to
appear. If derogatory information not
relating to any of these issues is deter-
mined during the course of the inter-
view, such information shall be for-
warded to the investigations unit for
appropriate action. If no unresolved de-
rogatory information is determined re-
lating to these issues, the petition
shall be approved and the conditional
basis of the investor's permanent resi-
dent status removed, regardless of any
action taken or contemplated regard-
ing other possible grounds for removal.

(d) *Decision*—(1) *Approval.* If, after ini-
tial review or after the interview,
USCIS approves the petition, USCIS
will remove the conditional basis of
the investor's permanent resident sta-
tus as of the second anniversary of the
date on which the investor acquired
conditional permanent residence.
USCIS shall provide written notice of
the decision to the investor. USCIS
may request the investor and deriva-
tive family members to appear for bio-
metrics at a USCIS facility for proc-
essing for a new Permanent Resident
Card.

(2) *Denial.* If, after initial review or
after the interview, USCIS denies the
petition, USCIS will provide written
notice to the investor of the decision
and the reason(s) therefore, and shall

issue a notice to appear. The investor's
lawful permanent resident status and
that of his or her spouse and any chil-
dren shall be terminated as of the date
of USCIS' written decision. The inves-
tor shall also be instructed to sur-
render any Permanent Resident Card
previously issued by USCIS. No appeal
shall lie from this decision; however,
the investor may seek review of the de-
cision in removal proceedings. In pro-
ceedings, the burden shall rest with
USCIS to establish by a preponderance
of the evidence that the facts and in-
formation in the investor's petition for
removal of conditions are not true and
that the petition was properly denied.

[59 FR 26591, May 23, 1994, as amended at 63
FR 70315, Dec. 21, 1998; 74 FR 26939, June 5,
2009; 84 FR 35809, July 24, 2019; 85 FR 46925,
Aug. 3, 2020]

## PART 217—VISA WAIVER PROGRAM

Sec.
217.1  Scope.
217.2  Eligibility.
217.3  Maintenance of status.
217.4  Inadmissibility and deportability.
217.5  Electronic System for Travel Author-
ization.
217.6  Carrier agreements.
217.7  Electronic data transmission require-
ment.

AUTHORITY: 8 U.S.C. 1103, 1187; 8 CFR part
2.

SOURCE: 53 FR 24901, June 30, 1988, unless
otherwise noted.

### §217.1  Scope.

The Visa Waiver Program (VWP) de-
scribed in this section is established
pursuant to the provisions of section
217 of the Act.

[62 FR 10351, Mar. 6, 1997, as amended at 87
FR 18980, Apr. 1, 2022]

### §217.2  Eligibility.

(a) *Definitions.* As used in this part,
the term:

*Carrier* refers to the owner, charterer,
lessee, or authorized agent of any com-
mercial vessel or commercial aircraft
engaged in transporting passengers to
the United States from a foreign place.

*Designated country* refers to Andorra,
Australia, Austria, Belgium, Brunei,

527

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT F

**Need help? Ask Emma** 

 U.S. Citizenship
and Immigration
Services

MENU

Home > Policy Manual > Volume 6 - Immigrants > Part G - Investors > Chapter 2 -
Immigrant Petition Eligibility Requirements

# Chapter 2 - Immigrant Petition Eligibility Requirements

**Guidance**

Resources (20)

Appendices (1)

Updates (17)

History (6)

The immigrant investor category requires three main elements:

- An investment of capital;
- Engagement in a new commercial enterprise; and
- Job creation.

Each element is explained in this chapter in the context of:

- The standalone program and the Regional Center Program for petitions filed before March 15, 2022;
- For standalone petitions filed on or after March 15, 2022; and
- New Regional Center Program petitions filed on or after May 14, 2022.[1]

For the general requirements, the term immigrant investor in this part of the Policy Manual refers to any employment-based 5th preference (EB-5) investor-petitioner, whether investing through the standalone program or the Regional Center Program. Where distinctions between the two programs exist, the term standalone immigrant investor refers to petitioners using the standalone program, and the term regional center immigrant investor refers to petitioners using the Regional Center Program.

# A. Investment of Capital

Congress created the immigrant investor category so the U.S. economy can benefit from an immigrant's contribution of capital. This benefit is greatest when capital is at risk and invested in a new commercial enterprise that, because of the investment, creates at least 10 full-time jobs for U.S. workers. The

regulations that govern the category define the terms capital and investment with this economic benefit in mind.[2]

# 1. Capital

The word capital does not mean only cash. Instead, the broad definition of capital takes into account the many different ways in which a person can make a contribution of financial value to a business.

The following table outlines how the EB-5 Reform and Integrity Act of 2022 refined the definition of capital.

## Definition of Capital

| For petitions filed before March 15, 2022 | For petitions filed on or after March 15, 2022[3] |
| --- | --- |
| Capital includes cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the immigrant investor, provided the immigrant investor is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness.[4] All capital must be valued at fair market value in U.S. dollars. | Congress has similarly defined "capital" as "cash and all real, personal, or mixed tangible assets owned and controlled by the . . . investor, or held in trust for the benefit of the [investor] and to which the [investor] has unrestricted access."[5] Also consistent with past definitions, the statute now provides that capital must be valued at fair market value in U.S. dollars, in accordance with Generally Accepted Accounting Principles or other standard accounting practice adopted by the U.S. Securities and Exchange Commission, at the time it is invested.[6] |

The immigrant investor must establish that they are the legal owner of the capital invested[7] and has obtained the capital through lawful means. USCIS does not consider as capital any assets acquired directly or indirectly by unlawful means, such as criminal activity.[8] As of May 14, 2022, gifts and loans to the investor are expressly permitted as capital, provided certain conditions are met.[9]

*Promissory Notes*

Capital can include the immigrant investor's promise to pay (a promissory note), as long as the immigrant investor is personally and primarily liable for the promissory note debt and his or her assets adequately secure the note. Any security interest must be perfected[10] to the extent provided for by the jurisdiction in which the asset is located.[11] Further, the assets securing the promissory note:

- Cannot include assets of the company in which the immigrant is investing;
- Must be specifically identified as securing the promissory note; and
- Must be fully amenable to seizure by a U.S. noteholder.[12]

The fair market value of a promissory note depends on its present value, not the value at any different time. In addition, to qualify as capital, nearly all of the money due under a promissory note must be payable within 2 years, without provisions for extensions.[13]

*Investing Indebtedness*



When investing indebtedness, an immigrant investor must demonstrate:

- The immigrant investor is personally and primarily liable for the debt;
- The indebtedness is secured by assets the immigrant investor owns; and
- The assets of the new commercial enterprise are not used to secure any of the indebtedness.

The immigrant investor must have primary responsibility, under the loan documents, for repaying the debt used to satisfy his or her minimum required investment amount.[14]

The immigrant investor must also demonstrate that his or her own collateral secures the indebtedness, and that the value of the collateral is sufficient to secure the amount of indebtedness that satisfies the immigrant investor's minimum required investment amount. Any indebtedness secured by the immigrant investor's assets qualifies as capital only up to the fair market value of the immigrant investor's pledged assets.

## 2. Investment

The immigrant investor is required to invest his or her own capital. The petitioner must document the path of the funds to establish that the investment was made, or is actively in the process of being made, with the immigrant investor's own funds.[15] For petitions filed on or after March 15, 2022, the capital must be expected to remain invested for not less than 2 years.[16]

To invest means to contribute capital. A loan from the immigrant investor to the new commercial enterprise does not count as a contribution of capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the immigrant investor and the new commercial enterprise is not a capital investment.[17]

To qualify as an investment, the immigrant investor must actually place his or her capital at risk. The mere intent to invest is not sufficient.[18]

Purchasing a share of a business from an existing shareholder, without more, does not qualify, since the payment goes to the former shareholder rather than to the new commercial enterprise.

*Guaranteed Returns*

If the immigrant investor is guaranteed a return, or a rate of return, on all or a portion of their capital, then the amount of any guaranteed return is not at risk.[19] For the capital to be at risk, there must be a risk of loss and a chance for gain.

Additionally, if the investor is guaranteed the right to eventual ownership or use of a particular asset in consideration of the investor's contribution of capital into the new commercial enterprise, the expected present value of the guaranteed ownership or use of such asset counts against the total amount of the investor's capital contribution in determining how much money was placed at risk. For example, if the immigrant investor is given a right of ownership or use of real estate, the present value of that real estate is not counted as investment capital put at risk of loss.[20]

Nothing prevents an immigrant investor from receiving a return on his or her capital in the form of a distribution of profits from the new commercial enterprise. This distribution of profits may happen during the conditional residency period and may happen before creating the required jobs. However, the

distribution cannot be a portion of the investor's minimum qualifying investment and cannot have been guaranteed to the investor.

*Redemption Language for Petitions Filed Before March 15, 2022*

USCIS relies on regulatory language and precedent decisions to address redemption agreements. The regulatory definition of "invest" excludes capital contributions that are "in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement."[21]

An agreement evidencing a preconceived intent to exit the investment as soon as possible after removing conditions on permanent residence may constitute an impermissible debt arrangement.[22] Funds contributed in exchange for a debt arrangement do not constitute a qualifying contribution of capital.[23] In general, the petitioner may not enter into the agreement knowing that he or she has a willing buyer at a certain time and for a certain price.[24]

Any agreement between the immigrant investor and the new commercial enterprise that provides the investor with a contractual right to repayment is an impermissible debt arrangement. In such a case, the investment funds do not constitute a qualifying contribution of capital.[25] Mandatory redemptions and options exercisable by the investor are two examples of agreements where the investor has a right to repayment. The impermissibility of such an arrangement cannot be remedied with the addition of other requirements or contingencies, such as conditioning the repurchase of the securities on the availability of funds; the delay of the repurchase until a date in the future (including after the adjudication of the Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829)); or the possibility that the investor might not exercise the right. In other words, repayment does not need to be guaranteed in order to be impermissible. It is the establishment of the investor's right to demand a repurchase, regardless of the new commercial enterprise's ability to fulfill the repurchase, that constitutes an impermissible debt arrangement.[26]

The following table describes certain characteristics that might be present in agreements and explains whether their inclusion creates an impermissible debt arrangement.

### Characteristics of Redemption Provisions

| Type of Provision | Description | Impermissible Agreement? |
|---|---|---|
| Mandatory redemptions | Arrangements that require the new commercial enterprise to redeem all or a portion of the petitioner's equity at a specified time or upon the occurrence of a specified event (for example, once the conditions are removed on the petitioner's permanent resident status) and for a specified price (whether fixed or subject to a specified formula). | USCIS considers this an impermissible debt arrangement. Such impermissible obligations are not subject to the discretion of the new commercial enterprise (although it may have some discretion regarding the timing and manner in which the redemption is performed). |

| Type of Provision | Description | Impermissible Agreement? |
|---|---|---|
| Options exercisable by the investor | Arrangements that grant the petitioner the option to require the new commercial enterprise to redeem all or a portion of his or her equity at a specified time or upon the occurrence of a specified event (for example, once the conditions are removed on the petitioner's permanent resident status) and for a specified price (whether fixed or subject to a specified formula). | USCIS considers this an impermissible debt arrangement. |
| Option exercisable by the new commercial enterprise | A redemption agreement between the immigrant investor and the new commercial enterprise that does not provide the investor with a right to repayment.<br><br>One example of such an agreement is a discretionary option held by the new commercial enterprise to repurchase investor shares. These options are typically structured similarly to options exercisable by the investor, except that the option is held and may be exercised by the new commercial enterprise. When executed, these options require an investor to sell all or a portion of his or her ownership interest back to that entity. | USCIS generally does not consider these arrangements to be impermissible debt arrangements.[27]<br><br>However, such an option may be impermissible if there is evidence the parties construct it in a manner that effectively converts it to a mandatory redemption or an option exercisable by the investor (considered a debt arrangement). For example, an arrangement would be impermissible if ancillary provisions or agreements obligate the new commercial enterprise to either (a) exercise the option (at a specified time, upon the occurrence of a specified event, or at the request of the investor) or (b) if it chooses not to exercise the option, liquidate the assets and refund the investor a specific amount. |

*Redemption Language for Petitions Filed on or after March 15, 2022*

On March 15, 2022, Congress enacted specific statutory provisions relating to agreements between the immigrant investor and the new commercial enterprise. For petitions filed on or after March 15, 2022, capital does not include:

- Capital invested in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the investor and the new commercial enterprise;

- Capital invested with a guaranteed rate of return on the amount invested by the investor; or

- In general, invested capital that is subject to any agreement between the investor and the new commercial enterprise that provides the investor with a contractual right to repayment, such as mandatory redemption at a certain time or upon the occurrence of a certain event, or a put or sell-back option held by the investor, even if such contractual right is contingent on the success of the new commercial enterprise, such as having sufficient available cash flow.[28]

However, the new statutory definition of capital includes (in other words, does not prohibit) capital invested that:

- Is subject to a buy back option that may be exercised solely at the discretion of the new commercial enterprise; and
- Results in the investor withdrawing their petition unless the investor has fulfilled their sustainment period and other program requirements.[29]

*Business Activity*

An immigrant investor must provide evidence of the actual undertaking of business activity. Merely establishing and capitalizing a new commercial enterprise and signing a commercial lease are not sufficient to show that an immigrant investor has placed his or her capital at risk.[30] Without some evidence of business activity, no assurance exists that the funds will be used to carry out the business of the commercial enterprise.[31]

*Made Available*

The full amount of the investment must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based.[32] In the regional center context, the immigrant investor must establish that the capital was invested into the new commercial enterprise and that the full amount was subsequently made available to the job-creating business(es), if separate.

In cases with a separate job-creating entity or entities, the payment of administrative fees, management fees, attorneys' fees, finders' fees, syndication fees, and other types of expenses or costs by the new commercial enterprise that erode the amount of capital made available to the job-creating entity do not count toward the minimum required investment amount.[33] The payment of these fees and expenses must be in addition to the minimum required capital investment amount.

*Sole Proprietors and Funds in Bank Accounts*

A standalone investor who is operating a new commercial enterprise as a sole proprietor cannot consider funds in his or her personal bank account as capital committed to the new commercial enterprise. Funds in a personal bank account are not necessarily committed to the new commercial enterprise. The funds must be in business bank accounts.[34] However, even a deposit into a business account over which petitioner exercises sole control, without more, may not satisfy the at-risk requirement.[35]

*Escrow Accounts*

An immigrant investor's money may be held in escrow until the investor has obtained conditional permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon:

- Approval of the investor's petition for classification under INA 203(b)(5); and

- Visa issuance and admission to the United States as a conditional permanent resident, or approval of the investor's Application to Register Permanent Residence or Adjust Status (Form I-485).

An immigrant investor's funds may be held in escrow within the United States to avoid any evidentiary issues that may arise with respect to issues such as significant currency fluctuations[36] and foreign capital export restrictions.

Use of foreign escrow accounts is not prohibited as long as the petition establishes that it is more likely than not that the minimum qualifying capital investment will be transferred to the new commercial enterprise in the United States upon the investor obtaining conditional permanent resident status.

When adjudicating the immigrant investor's petition to remove conditions,[37] USCIS requires evidence verifying that the escrowed funds were released and that the investment was sustained in the new commercial enterprise for the period of the immigrant investor's residence in the United States.

*Deployment of Capital*

Before the job creation requirement is met, a new commercial enterprise may deploy capital directly or through any financial instrument so long as applicable requirements are satisfied, including the following:

- The immigrant investor must have placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk;
- There must be a risk of loss and a chance for gain;
- Business activity must actually be undertaken;
- The full amount of the investment must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based;[38] and
- A sufficient relationship to commercial activity (namely, engagement in commerce, that is, the exchange of goods or services) exists such that the enterprise is and remains commercial.[39]

The purchase of financial instruments traded on secondary markets generally does not satisfy these requirements because such secondary market purchases generally:

- Are not related to the actual undertaking of business activity;
- Do not make capital available to the job-creating business; and
- Represent an activity that is solely or primarily financial rather than commercial in nature.

*Further Deployment After the Job Creation Requirement is Satisfied*

Once the job creation requirement has been met and the investment capital is returned or otherwise available to the new commercial enterprise, the new commercial enterprise may further deploy such capital within a reasonable amount of time[40] in order to satisfy applicable requirements for continued eligibility.[41] The capital may be further deployed, as described above, into any commercial activity that is consistent with the purpose of the new commercial enterprise to engage in the "ongoing conduct of lawful business,"[42] including as may be evidenced in any amendments to the offering documents made to describe the further deployment into such activities.[43]

Consistent with precedent case decisions and existing regulatory requirements, further deployment must continue to meet all applicable eligibility requirements within the framework of the initial bases of

eligibility,[44] including the same new commercial enterprise.[45] The further deployment does not need to remain with the same (or any) job creating entity or in a targeted employment area (TEA).

For example, if a new commercial enterprise associated with a regional center loaned pooled investment capital to a job-creating entity that created sufficient jobs through the construction of a residential building in a TEA, the new commercial enterprise, upon repayment of the loan that resulted in the required job creation, may generally further deploy the repaid capital anywhere in the United States or its territories (regardless of whether it would qualify as a TEA) into any commercial activity that satisfies applicable requirements such as one or more similar loans to other entities.

For regional center petitions filed on or after May 14, 2022, further deployment is permitted under the following conditions:

- The new commercial enterprise has executed the business plan for a capital investment project in good faith without a material change;
- The new commercial enterprise has created a sufficient number of new full-time positions to satisfy the job creation requirements of the program for all investors in the new commercial enterprise, either directly or indirectly, as evidenced by the methodologies set forth in the statute;[46]
- The job creating entity has repaid the capital initially deployed in conformity with the initial investment contemplated by the business plan; and
- The capital, after repayment by the job creating entity, remains at risk and it is not redeployed in passive investments, such as stocks or bonds.[47]

## 3. Required Amount of Investment

The immigrant investor must invest at least the standard minimum investment amount in capital in a new commercial enterprise that creates no fewer than 10 jobs for U.S. workers. An exception exists if the immigrant investor invests their capital in a new commercial enterprise that is principally doing business in and creates jobs in a TEA or, for regional center petitions filed on or after May 14, 2022, in an infrastructure project.

This means that the present fair market value, in U.S. dollars, of the immigrant investor's lawfully-derived capital must be at least $1,000,000, or $500,000 if investing in a TEA for petitions filed before March 15, 2022.[48] For petitions filed on or after March 15, 2022, those amounts are $1,050,000 or $800,000 if investing in a TEA or infrastructure project, and will automatically increase January 1, 2027, and every 5 years thereafter.[49]

Immigrant investors may diversify their investment across a portfolio of businesses or projects, but only if the minimum investment amount is first placed in a single new commercial enterprise. In such a case, it is necessary to show how eligibility has been established (for example, the minimum investment amount, evidence of an at-risk investment,[50] and job creation) with respect to each job-creating entity at the time of filing.

For standalone investors, the capital may be deployed into a portfolio of wholly owned businesses, so long as all capital is deployed through a single commercial enterprise comprised of a holding company and its wholly owned subsidiaries and all jobs are created directly within that commercial enterprise (in other words, through the portfolio of wholly owned subsidiaries that received the capital through the holding company).

For example, for a petition filed before March 15, 2022, based on an investment in an area in which the minimum investment amount is $1,000,000, the standalone investor can satisfy the statute by investing in a holding company that deploys $600,000 of the investment toward one subsidiary that the holding company wholly owns, and $400,000 of the investment toward another subsidiary that the holding company wholly owns.[51] In this example, the two wholly owned subsidiaries would have to create an aggregate of 10 new jobs between them. However, a standalone investor cannot qualify by separately investing $600,000 in one commercial enterprise and $400,000 in a different commercial enterprise, since these enterprises would be separate rather than consisting of a singular commercial enterprise comprised of a holding company and its wholly owned subsidiaries.

In the regional center context, where indirect jobs may be counted, the commercial enterprise may create jobs indirectly through multiple investments in corporate affiliates or in unrelated entities, but the regional center investor cannot qualify by investing directly in those multiple entities. Instead, the regional center investor's capital must still be invested in a single commercial enterprise, which can then deploy that capital to multiple job-creating entities as long as the portfolio of businesses or projects can create the required number of jobs.

## 4. Lawful Source of Funds

*For Petitions Filed before May 14, 2022[52]*

The immigrant investor must demonstrate by a preponderance of the evidence that the capital invested, or actively in the process of being invested, in the new commercial enterprise was obtained through lawful means.[53] Any assets acquired directly or indirectly by unlawful means, such as criminal activity, are not considered capital.[54] In establishing that the capital was acquired through lawful means, the immigrant investor must provide evidence demonstrating the direct and indirect source of his or her investment capital.[55]

As evidence of the lawful source of funds, the immigrant investor's petition must be accompanied, as applicable, by:

- Foreign business registration records;
- Corporate, partnership, or any other entity in any form which has filed in any country or subdivision thereof any return described in this list, and personal tax returns, including income, franchise, property (whether real, personal, intangible), or any other tax returns of any kind filed within 5 years, with any taxing jurisdiction in or outside the United States by or on behalf of the immigrant investor;
- Evidence identifying any other source(s) of capital; or
- Certified copies of any judgments or evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving monetary judgments against the immigrant investor from any court in or outside the United States within the past 15 years.[56]

The immigrant investor is required to submit evidence identifying any other source of capital. Such evidence may include:

- Corporate, partnership, or other business entity annual reports;
- Audited financial statements;

- Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by the immigrant investor's own assets, other than those of the new commercial enterprise, and for which the immigrant investor is personally and primarily liable;

- Evidence of income such as earnings statements or official correspondence from current or prior employers stating when the immigrant investor worked for the company and how much income the immigrant investor received during employment;

- Gift instrument(s) documenting gifts to the immigrant investor;

- Evidence, other than tax returns,[57] of payment of individual income tax, such as an individual income tax report or payment certificate, on the following:

  - Wages and salaries;

  - Income from labor and service or business activities;

  - Income or royalties from published books, articles, photographs, or other sources;

  - Royalties or income from patents or special rights;

  - Interest, dividends, and bonuses;

  - Rental income;

  - Income from property transfers;

  - Any incidental income or other taxable income determined by the relevant financial department;

- Evidence of property ownership, including property purchase or sale documentation; or

- Evidence identifying any other source of capital.

*For Petitions Filed on or after May 14, 2022*[58]

Effective on May 14, 2022, the immigrant investor must submit the following evidence, as applicable, to demonstrate the lawful source of the invested funds and any funds used to pay administrative costs and fees:

- Business and tax records, or similar records, including:

  - Foreign business registration records; and

  - Corporate or partnership tax returns (or tax returns of any other entity in any form filed in any country or subdivision of such country);

- Personal tax returns, including income, franchise, property (whether real, personal, or intangible), or any other tax returns of any kind, filed during the past 7 years (or another period to be determined by the Secretary to ensure that the investment is obtained from a lawful source of funds) with any taxing jurisdiction within or outside the United States by or on behalf of the investor;

- Any other evidence identifying any other source of capital or administrative fees; and

- Evidence related to monetary judgments against the investor, including:

  - Certified copies of any judgments, and evidence of all pending governmental civil or criminal actions, governmental administrative proceedings, and any private civil actions (pending or otherwise) involving possible monetary judgments against the investor from any court within or outside the United States; and

o The identity of all persons who transfer into the United States, on behalf of the investor, any funds that are used to meet the capital requirement.[59]

As of May 14, 2022, by statute, gifts and borrowed funds are expressly permissible for petitions filed on or after that date, provided:

- They were gifted or loaned to the investor in good faith; and

- They were not gifted or loaned to circumvent any limitations imposed on permissible sources of capital, including, but not limited to, proceeds from illegal activity.[60]

Investors relying on gifted or borrowed funds must demonstrate the lawful source of those funds by submitting the evidence described above for the donor or, if not a bank, the lender.[61]

# 5. Targeted Employment Area

A TEA is a rural area or an area that has experienced high unemployment.[62] A rural area is any area other than an area within a standard metropolitan statistical area (MSA) (as designated by the Office of Management and Budget) or within the outer boundary of any city or town having a population of 20,000 or more based on the most recent decennial census of the United States.[63] For petitions filed before March 15, 2022, a high unemployment area is an area that has experienced unemployment of at least 150 percent of the national average rate.[64] For petitions filed on or after March 15, 2022, a high unemployment area is an area designated as such by the Secretary of Homeland Security under INA 203(b)(5)(B)(ii).

Congress provided for a reduced investment amount in a TEA to encourage investment in new commercial enterprises principally doing business in and creating jobs in areas of greatest need. For the lower capital investment amount to apply, the new commercial enterprise into which the immigrant invests or the actual job-creating entity must be principally doing business in the TEA.

A new commercial enterprise is principally doing business in the location where it regularly, systematically, and continuously provides goods or services that support job creation. If the new commercial enterprise provides such goods or services in more than one location, it will be principally doing business in the location most significantly related to the job creation.

Factors considered in determining where a new commercial enterprise is principally doing business include, but are not limited to, the location of:

- Any jobs directly created by the new commercial enterprise;

- Any expenditure of capital related to the creation of jobs;

- The new commercial enterprise's day-to-day operation; and

- The new commercial enterprise's assets used in the creation of jobs.[65]

Investments through regional centers allow the immigrant investor to seek to establish indirect job creation. In these cases, the job-creating entity, rather than the new commercial enterprise, determines where the entity is principally doing business. The job-creating entity must be principally doing business in the TEA for the lower capital investment amount to apply.[66]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT G

specify a higher investment amount if the investment is in a high employment area or a lesser investment amount if the investment is in a TEA, defined to include certain rural areas and areas of high unemployment. *Id.*; 8 CFR 204.6(f). The INA allots 9,940 immigrant visas each fiscal year for foreign nationals seeking to enter the United States under the EB–5 classification. *See* INA section 201(d), 8 U.S.C. 1151(d); INA section 203(b)(5), 8 U.S.C. 1153(b)(5). Not less than 3,000 of these visas must be reserved for foreign nationals investing in TEAs. *See* INA section 203(b)(5)(B), 8 U.S.C. 1153(b)(5)(B).

### B. The Regional Center Program

Enacted in 1992, section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Public Law 102–395, 106 Stat. 1828, established a pilot program that requires the allocation of a limited number of EB–5 immigrant visas to individuals who invest through DHS-designated regional centers. The Regional Center Program was initially designed as a pilot program set to expire after 5 years, but Congress has continued to extend the program to the present day. *See, e.g.,* Public Law 115–141, Div. M, Tit. II, sec. 204 (Mar. 23, 2018).

Under the Regional Center Program, foreign nationals base their EB–5 petitions on investments in new commercial enterprises located within "regional centers." DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. *See* 8 CFR 204.6(e). While all EB–5 petitioners go through the same petition process, those petitioners participating in the Regional Center Program may meet statutory job creation requirements based on economic projections of either *direct* or *indirect* job creation, rather than only on jobs directly created by the new commercial enterprise. *See* 8 CFR 204.6(m)(3). In addition, Congress authorized the Secretary to give priority to EB–5 petitions filed through the Regional Center Program. *See* section 601(d) of Public Law 102–395, 106 Stat. 1828, as amended by Public Law 112–176, Sec. 1, 126 Stat. 1326 (Sept. 28, 2012).

Requests for regional center designation must be filed with USCIS on the Application for Regional Center Designation Under the Immigrant Investor Program (Form I–924). *See* 8 CFR 204.6(m)(3)–(4). Once designated, regional centers must provide USCIS with updated information to

demonstrate continued eligibility for the designation by submitting an Annual Certification of Regional Center (Form I–924A) on an annual basis or as otherwise requested by USCIS. *See* 8 CFR 204.6(m)(6)(i)(B). USCIS may seek to terminate a regional center's participation in the program if the regional center no longer qualifies for the designation, the regional center fails to submit the required information or pay the associated fee, or USCIS determines that the regional center is no longer promoting economic growth. *See* 8 CFR 204.6(m)(6)(i). As of September 10, 2018, there were 886 designated regional centers.

### C. EB–5 Immigrant Visa Process

A foreign national seeking LPR status under the EB–5 immigrant visa classification must go through a multi-step process during which the investor must sustain the investment. The individual must first file an Immigrant Petition by Alien Investor (Form I–526, or "EB–5 petition") with USCIS. The petition must be supported by evidence that <mark>the foreign national's lawfully obtained capital is invested (*i.e.,* placed at risk), or is actively in the</mark> process of being invested, in a new commercial enterprise in the United States that will create full-time positions for not fewer than 10 qualifying employees.[6] *See* 8 CFR 204.6(j).

If USCIS approves the EB–5 petition, the petitioner must take additional steps to obtain LPR status. In general, the petitioner may either apply for an immigrant visa through a Department of State (DOS) consular post abroad or, if the petitioner is already in the United States and is otherwise eligible to adjust status, the petitioner may seek adjustment of status by filing an Application to Register Permanent Residence or Adjust Status (Form I–485, or "application for adjustment of status") with USCIS. Congress has imposed limits on the availability of such immigrant visas, including by capping the annual number of visas available in the EB–5 category and by separately limiting the percentage of immigrant visas that may be issued on an annual basis to individuals born in any one country.

To request an immigrant visa while abroad, an EB–5 petitioner must apply

at a U.S. consular post. *See* INA sections 203(e) and (g), 221 and 222, 8 U.S.C. 1153(e) and (g), 1201 and 1202; *see also* 22 CFR part 42, subparts F and G. The petitioner must generally wait to receive a visa application packet from the DOS National Visa Center to commence the visa application process. After receiving this packet, the petitioner must collect required information and file the immigrant visa application with DOS. As noted above, the wait for the visa depends on the demand for immigrant visas in the EB–5 category and the petitioner's country of birth.[7] Generally, DOS authorizes the issuance of a visa and schedules the petitioner for an immigrant visa interview for the month in which the priority date will be current. If the petitioner's immigrant visa application is ultimately approved, he or she is issued an immigrant visa and, on the date of admission to the United States, obtains LPR status on a conditional basis. *See* INA sections 211, 216A, and 221, 8 U.S.C. 1181, 1186, and 1201.

Alternatively, an EB–5 petitioner who is in the United States in lawful nonimmigrant status generally may seek LPR status by filing with USCIS an application for adjustment of status, Form I–485. *See* INA section 245, 8 U.S.C. 1255; 8 CFR part 245. Before filing such an application, however, the EB–5 petitioner must wait until an immigrant visa is "immediately available." *See* INA section 245(a), 8 U.S.C. 1255(a); 8 CFR 245.2(a)(2)(i)(A). Generally, an immigrant visa is considered "immediately available" if the petitioner's priority date under the EB–5 category is earlier than the relevant date indicated in the monthly DOS Visa Bulletin. *See* 8 CFR 245.1(g)(1).

Whether obtained through the issuance of an immigrant visa or adjustment of status, LPR status based on an EB–5 petition is granted on a conditional basis. *See* INA section 216A(a)(1), 8 U.S.C. 1186b(a)(1). Within the 90-day period preceding the second anniversary of the date the immigrant investor obtains conditional permanent resident status, the immigrant investor must file with USCIS a Petition by Investor to Remove Conditions on Permanent Resident Status (Form I–829). *See* INA section 216A(c) and (d),

---

[6] Under current USCIS policy, the investor must sustain these actions through the end of the sustainment period (2 years from the date the investor obtains conditional resident status). The total amount of time will vary, however, depending on when the investor firsts invests or becomes actively in the process of investing as well as the amount of time the investor may wait to obtain status due to oversubscription for the investor's nationality.

[7] When demand for a visa exceeds the number of visas available for that category and country, the demand for that particular preference category and country of birth is deemed oversubscribed. The Department of State (DOS) publishes a Visa Bulletin that determines when a visa may be authorized for issuance. *See* U.S. Dep't of State, Bureau of Consular Aff., Visa Bulletin, *available at https://travel.state.gov/content/visas/en/law-and-policy/bulletin.html.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT H

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01JAN19 | C | 01MAY12 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01MAR12 | C | 15JAN12 | C | C |
| 4th | C | C | 15MAR19 | C | 01APR20 | C |
| Certain Religious Workers | C | C | 15MAR19 | C | 01APR20 | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

**B.   DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS**

The chart below reflects dates for filing visa applications within a timeframe
justifying immediate action in the application process. Applicants for immigrant visas
who have a priority date <u>earlier than</u> the application date in the chart may assemble
and submit required documents to the Department of State's National Visa Center,
following receipt of notification from the National Visa Center containing detailed
instructions. The application date for an oversubscribed category is the priority date
of the first applicant who cannot submit documentation to the National Visa Center for
an immigrant visa. If a category is designated "current," all applicants in the
relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be
filed regardless of the applicant's priority date. The listing of a date for any
category indicates that only applicants with a priority date which is **earlier** than the
listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined
that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for
filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 08JUL13 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01MAY15 | C | 22JAN12 | C | C |
| 4th | C | C | 15MAY19 | C | C | C |
| Certain Religious Workers | C | C | 15MAY19 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 15DEC15 | C | C | C | C |

-4-                                          January 2022

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 22JAN19 | C | 08JUL12 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01MAR12 | C | 15JAN12 | C | C |
| 4th | C | C | 15MAR19 | C | 01APR20 | C |
| Certain Religious Workers | C | C | 15MAR19 | C | 01APR20 | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

## B.  DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date <u>earlier than</u> the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 08JUL13 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01MAY15 | C | 22JAN12 | C | C |
| 4th | C | C | 15MAY19 | C | C | C |
| Certain Religious Workers | C | C | 15MAY19 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 15DEC15 | C | C | C | C |

-4-                                        February 2022

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01MAR19 | C | 01JAN13 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01APR12 | C | 15JAN12 | C | C |
| 4th | C | C | 15MAR19 | C | 01APR20 | C |
| Certain Religious Workers | C | C | 15MAR19 | C | 01APR20 | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

**B.   DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS**

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date earlier than the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 01SEP13 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01JUN15 | C | 22JAN12 | C | C |
| 4th | C | C | 15MAY19 | C | C | C |
| Certain Religious Workers | C | C | 15MAY19 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 15DEC15 | C | C | C | C |

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01MAR19 | C | 01MAY13 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01MAY12 | C | 15JAN12 | C | C |
| 4th | C | C | 01MAY17 | C | 01APR20 | C |
| Certain Religious Workers | U | U | U | U | U | U |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

B.  <u>DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS</u>

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date <u>earlier than</u> the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 01SEP13 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01JUL15 | C | 22JAN12 | C | C |
| 4th | C | C | 01JUN17 | C | C | C |
| Certain Religious Workers | C | C | 01JUN17 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 15DEC15 | C | C | C | C |

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01MAR19 | C | 08JUL13 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01JUN12 | C | 15JAN12 | C | C |
| 4th | C | C | 01MAY17 | C | 01APR20 | C |
| Certain Religious Workers | U | U | U | U | U | U |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | U | U | U | U | U | U |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

### B.  <u>DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS</u>

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date <u>earlier than</u> the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 01SEP14 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01AUG15 | C | 22JAN12 | C | C |
| 4th | C | C | 01JUN17 | C | C | C |
| Certain Religious Workers | C | C | 01JUN17 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | C | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 15DEC15 | C | C | C | C |

## A. <u>FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES</u>

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| <u>Employment-Based</u> | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01MAR19 | C | 01SEP13 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01JUN12 | C | 15JAN12 | C | C |
| 4th | C | C | 01MAY17 | C | 01APR20 | C |
| Certain Religious Workers | C | C | 01MAY17 | C | 01APR20 | C |
| 5th Unreserved (C5, T5, and all others) | C | C | C | C | C | C |
| 5th Unreserved (I5 and R5) | C | 22NOV15 | C | C | C | C |
| 5th Set Asides: | | | | | | |
| Rural (20%) | C | C | C | C | C | C |
| High Unemployment (10%) | C | C | C | C | C | C |
| Infra-structure (2%) | C | C | C | C | C | C |

\*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105–139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

### B.   DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date <u>earlier than</u> the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR19 | C | 01DEC14 | C | C |
| 3rd | C | 01APR18 | C | 22JAN12 | C | C |
| Other Workers | C | 01AUG15 | C | 22JAN12 | C | C |
| 4th | C | C | 15JUN17 | C | C | C |
| Certain Religious Workers | C | C | 15JUN17 | C | C | C |
| 5th Unreserved (C5, T5, and all others) | C | C | C | C | C | C |
| 5th Unreserved (I5 and R5) | C | 15DEC15 | C | C | C | C |